# FOR PUBLICATION

ATTORNEYS FOR APPELLANT:

**SCOTT E. SHOCKLEY**
**JAMES R. WILLIAMS**
DeFur Voran LLP
Muncie, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**IAN MCLEAN**
Deputy Attorney General
Indianapolis, Indiana



FILED

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

CHRISTOPHER SMITH,                    )
                                      )
    Appellant-Defendant,              )
                                      )
        vs.                           )    No. 18A02-1204-CR-331
                                      )
STATE OF INDIANA,                     )
                                      )
    Appellee-Plaintiff.               )

APPEAL FROM THE DELAWARE CIRCUIT COURT
The Honorable Thomas A. Cannon, Jr., Judge
Cause No. 18C05-1103-CM-1

**January 30, 2013**

**OPINION - FOR PUBLICATION**

**BROWN, Judge**

Christopher Smith appeals his conviction for failure to immediately report child abuse or neglect as a class B misdemeanor.[1] Smith raises several issues, one of which we find dispositive and restate as whether the evidence is sufficient to sustain his conviction.[2] We reverse.

## FACTS

In November 2010, G.G. was sixteen years old and a student at Muncie Central High School. Smith was the principal at the high school and had held that position for approximately two and one-half years. G.G. had been placed with the Youth Opportunity Center (the "YOC") pursuant to a dispositional order in March 2010 after being found to be a child in need of services, and the Department of Child Services ("DCS") and the YOC entered into a contract with respect to G.G.'s placement.

Between 12:20 and 12:25 p.m. on November 9, 2010, G.G. reported to Kathaleena McCord, who had been an assistant principal at Muncie Central for one and one-half years and had sixteen years of experience in other school systems, that she had been raped in the boys' bathroom by the pool by S.M. At the time, S.M. was also a sixteen-year-old student at the school. McCord went to Smith's office and informed him of what G.G. had reported and brought Smith back to her office. McCord asked G.G. to repeat to Smith what had occurred to her, and G.G. told Smith that she had been raped in the

---

[1] Ind. Code § 31-33-22-1 (2004).

[2] Smith also raises an issue regarding whether the statutory provisions which govern the offense are unconstitutionally void for vagueness. Because we reverse on other grounds, we do not address this issue.

2

bathroom. Smith asked G.G. who committed the act and when it occurred, and G.G. responded that S.M. committed the act in the boys' bathroom at lunch.

Smith retrieved Jackie Samuels, the associate principal, from her office at 12:38 p.m.[3] Smith said "what should we do," and Samuels stated that they needed to call for the nurse right away. Transcript at 61. Samuels also asked Smith if he wanted her to call the YOC or contact S.M. or the school's security officers. Smith said "[n]ot yet, call YOC." Id. Smith radioed for Trudy Anderson, who had been employed as the nurse and medical professional at Muncie Central for three years and had worked for Muncie Community Schools for nineteen years, to come to his office. At approximately 12:40 p.m., Smith informed Anderson that a female student had reported that she had been raped by a male student in a restroom at the school, and Smith directed Anderson to McCord's office where G.G. was located. Anderson arrived at McCord's office at approximately the same time that Samuels exited Smith's office to return to her office to call the YOC.

Also, at some point within five or ten minutes after G.G. disclosed that she had been raped, Samuels informed Smith and McCord that G.G. was the same student who, earlier in the school year, had faked a gran mal seizure in the back hallway of the school building.[4] Also at some point, McCord stated that she had seen S.M. with a female prior

---

[3] Samuels had previously served as a program supervisor at the YOC for about five months.

[4] Samuels testified that Smith was present at the time G.G. had faked the seizure. Samuels testified that she had been present when the nurse determined that G.G. had faked a seizure. Samuels further testified that G.G. "had an attendance issue where she said she had been someplace else and she wasn't there." Transcript at 71.

During a police interview, Smith stated that he had reservations about G.G.'s allegations because he was aware that G.G. "had in the past told . . . a pretty big lie" and that she had "faked a seizure in our

to the beginning of lunch in the back hallway and that she thought she may be able to obtain a video recording of the hallway. Smith told McCord to see if she could "trace their whereabouts during the lunch time," and McCord went to the camera room and began to review the recordings which took over an hour. Id. at 18.

Anderson entered McCord's office and observed that G.G. was not audibly crying but did have tears coming down her face and that her face was a little wet from the tears. Anderson noted that, while G.G. was visibly shaken, there were no obvious physical injuries or scratches. Anderson asked G.G., in McCord's presence, if she was hurt, and G.G. stated that her vagina hurt. Anderson did not pass that information along to Smith at that point. Smith asked McCord to make a written statement of G.G.'s allegations, and McCord entered the office where G.G. and Anderson were present, gave G.G. a pen and clipboard, and told her that Smith had requested that she write the events to the best of her recollection. G.G. did not hesitate, wrote a statement in a few minutes, and was very centered and focused on writing.[5] At some point around 12:50 p.m., Smith entered McCord's office, reviewed the statement G.G. had written, and asked G.G. some

back hallway." State's Exhibit 4a at 21. Smith stated that he had received a radio call the day of the seizure, had gone to the hallway, and that he, Samuels, the school nurse, and another teacher or adult were present. Smith stated that he did not medically know whether or not G.G. was faking the seizure, "[b]ut the nurse certainly knew enough to think that she was" and "when she called YOC about that situation [] to let them know that she[] had this seizure [] they said, 'oh [] she's done this before'. And put her on a bus and send her home." Id. at 22.

During her testimony, Anderson, the school's nurse, indicated that she determined in her judgment that G.G. was not in fact having a seizure and that it appeared to her that G.G. was faking or feigning the seizure.

[5] G.G.'s written statement was admitted into evidence at trial and stated in part that, after the assault, she had gone to the girls' restroom and "saw that [she] was bleeding," that a few minutes later she "went to the locker room to see if [she] had any clothes in there but [] didn't," that she asked a friend if she had a change of clothes, that G.G. changed into a pair of her friend's pants in the gym, and that then she and the friend went to McCord's office. Joint Exhibit 1.

questions. Anderson stayed with G.G. and waited for the YOC, as G.G.'s guardian, to be contacted.[6] Anderson also noted, during the ninety-minute period she waited with G.G., that G.G.'s condition improved and that she became much more calm and discussed her family, siblings, and pets.

Further, at approximately 12:40 or 12:45 p.m., while Anderson was with G.G. and after Smith had told Samuels to call the YOC, Samuels walked back to her office to call the YOC. Samuels called the switchboard operator at the YOC, who attempted to transfer the call to Cottage 9 where G.G. lived, and there was no answer. Samuels called the YOC switchboard again and stated that she needed to talk to a person associated with Cottage 9 immediately, and after a brief time on hold, Crystal Dunigan answered the call. Dunigan stated that she was the acting cottage manager, and Samuels stated that G.G. had reported that she had been raped. Samuels and Dunigan discussed G.G., and Dunigan asked about G.G. and her demeanor. Samuels stated that G.G. was with the nurse and was upset. Samuels then asked Dunigan how G.G. had been doing, and Dunigan stated that G.G. had been doing better. According to Dunigan, Samuels stated that the allegation "was not in the nature of [S.M.]" and that she had "seen [G.G.] make some false allegations of a seizure." Id. at 141. Dunigan stated that she needed to speak with the counselor and cottage manager, and Dunigan and Samuels ended the call. Samuels then informed Smith that she had called the YOC and then went to McCord's office to visit G.G. and see "how was she acting." Id. at 67.

---

[6] Anderson testified that, in the absence of a medical emergency, the school board's policy was to first contact a child's guardian and then to make arrangements with the guardian to have the child receive medical attention.

After the call, Dunigan contacted Justin Wallen, the cottage manager where G.G. resided, and Wallen told Dunigan that she needed to call G.G.'s case manager Annette, who was a part of DCS, for permission for the YOC to take G.G. to the emergency room. Dunigan contacted Annette at DCS soon after 1:00 p.m. and reported the incident, and Annette approved the action of taking G.G. to the emergency room for a rape kit. Dunigan then informed Wallen and the counselor of the YOC's intended actions. Dunigan then informed Samuels that the YOC was sending a staff person to transport G.G. to the emergency room for a rape kit.[7] According to Samuels, Dunigan stated during the conversation that "I know she's cried wolf before." Id. at 70. The YOC sent Tameka Ross to transport G.G.[8]

Meanwhile, between 12:45 and 1:00 p.m., after speaking with Samuels, Smith called the Muncie Central administration building in an attempt to contact Assistant Superintendent Tim Heller. However, Heller was unavailable and Smith was transferred to Joanne McCowan, the Director of Secondary Education who had been with Muncie Community Schools for seventeen or eighteen years. Smith informed McCowan that he was trying to reach Heller and explained G.G.'s allegations, that G.G. was a resident of the YOC, and that Samuels had already contacted the YOC. Smith stated "[t]hey questioned if she was being truthful and indicated they would come pick her up and take her to Ball Memorial Hospital." Id. at 108. Smith stated that he wanted to ask whether

---

[7] Dunigan testified that she called Samuels, whereas Samuels testified that Dunigan had asked Samuels to call her back during the first phone conversation and that she had called Dunigan back. Also, Dunigan testified that she could not recall whether she had told Samuels that DCS had been contacted.

[8] Wallen indicated during his testimony that the YOC was required to notify DCS immediately of any event that requires hospitalization and that Dunigan had notified DCS at 1:00 p.m.

he should have a security officer present during the questioning of S.M., and McCowan told Smith that she would contact someone else in the administrative building to give him an answer and then put him on hold. McCowan went to Lon Sloan and explained what Smith had said. Sloan was the Director of Human Resources, was a member of the superintendent's cabinet, had worked in the school system since 1976 and at least nineteen or twenty years as an administrator, and had been a Delaware County Sheriff's Reserve Officer since 1974. Sloan stated that, since it was not certain if the matter was a criminal matter, Smith "should go ahead and call the young man down, get information but he should have another administrator present with him when he did so." Id. at 109. McCowan returned to the phone and gave Smith the information from Sloan. McCowan also stated that she would see Smith soon because interviews had been scheduled for an available administrative position and that she would be traveling to Muncie Central.

About 1:25 p.m., Smith asked Samuels to bring S.M. to the office for questioning. S.M. was questioned in the presence of Samuels and also, for at least part of the questioning, by Tom Jarvis, the Athletic Director at the school.[9] S.M. denied G.G.'s allegations. Samuels noted that S.M. first stated that he went to the library and then later stated that he went to the bathroom in the back hallway away from the library. At one point, Jarvis asked Smith, in S.M.'s presence, whether this was a school matter or a

---

[9] Jarvis had been the Athletic Director for ten years, had been a principal at other schools for five years and an assistant principal at another school for two and one-half years. At the time of trial, Jarvis was the principal at Muncie Central High School.

police matter.[10] According to Jarvis, Smith stated "well Mr. Jarvis, currently it's a school matter." Id. at 231. S.M. stated that he and G.G. had been writing some notes but that he had thrown the notes away. S.M. was questioned for about fifteen or twenty minutes and then left the office.

After the interview, Jarvis told Smith that he felt that S.M. was lying and that the notes would probably be in his locker. Because Smith needed to attend previously-scheduled interviews, he asked Jarvis to search the lockers of G.G. and S.M. Jarvis obtained the locker combinations from his secretary and radioed Officer Michael Edwards, who was an off-duty Muncie Police Officer working as a security officer at the high school, and asked Officer Edwards to meet him. Jarvis stated that he was "looking for some notes between 2 students and . . . really wasn't sure what the true allegation was, if it was consensual or he said she said . . . ."[11] Id. at 234. Jarvis discovered notes

---

[10] Jarvis testified at trial that he asked the question in part as a scare tactic so that S.M. would "maybe talk a little bit" and in part "to maybe hint that, to [] Smith, that maybe this should be a police matter." Transcript at 230.

[11] Officer Edwards testified at trial that Jarvis told him that they were searching the lockers for "love letters," that Officer Edwards stated that was a "kind of an odd thing to be looking for," that Jarvis responded that there had been a rape, and that Jarvis "implied at the YOC" and "even motioned his hand toward the YOC direction." Transcript at 249, 254. Officer Edwards also indicated that Jarvis told him that "the girl was a known story teller or liar" and that the "letters would help prove that." Id. at 255. Officer Edwards testified that he first learned that the alleged rape occurred at the school building after 4:00 p.m. when his sergeant informed him that the rape had been at the school building. Officer Edwards's sergeant had him immediately travel to the hospital, where he met other police officers. Officer Edwards was later removed as the investigating officer and replaced by Officer George Hopper because the department felt it would have been a conflict of interest for Officer Edwards to be assigned to the case.

Jarvis testified at trial that, at the time of S.M.'s questioning, he believed that the police should have been contacted before the questioning due to the nature and seriousness of the questioning. Jarvis further testified that, when he met Officer Edwards, he did not specifically tell him that a student had claimed or reported that she had been raped at the school building. Jarvis indicated that, when he told Officer Edwards there was an allegation of a sexual assault, Officer Edwards told him that "this is the first [he had] heard of it." Id. at 240. When asked if he did anything other than tell Officer Edwards that a sexual assault occurred to ensure that the police would become actively involved, Jarvis testified "other

of a sexual nature in both lockers but did not have any idea who wrote the notes or if they related to the incident.

Ross arrived at Muncie Central at approximately 2:00 p.m. and transported G.G. to Ball Memorial Hospital. There was a delay in examining G.G. at the hospital because an assault nurse was not initially available. The hospital nurse or staff person called the Muncie Police at 3:25 p.m., and law enforcement officers arrived at the hospital at about 3:55 p.m. At some point, Smith called Ross and asked about G.G.'s condition and asked "where, Central was suppose[d] to file the report or was YOC going to handle it." Id. at 151. Ross responded that she "figured Central would make the report since it happened at Central." Id. At the time that Smith called, the rape kit had not yet been completed.

Smith, Sloan, McCowan, and Samuels were on an interview team, and they were scheduled to interview two candidates for an administrative position which would take approximately two hours in the afternoon. Between the interviews, Smith and Samuels left the interview area and returned and stated that the rape kit test had still not been administered.

After the second interview had concluded and Smith was thanking a candidate, Sloan asked if Assistant Superintendent Heller had been contacted. McCowan did not have a response, and Smith stated that he had not spoken to Heller. Sloan asked about the location of the closest telephone. Smith retrieved a telephone, placed it on the table, dialed the phone number for Heller, and placed a conference call on speaker phone so

---

than looking for the notes, no." Id. When asked why he did not make it clear to Officer Edwards that the incident happened at the high school, Jarvis testified: "I assumed he knew that that was what happened at Central." Id. When asked why he would assume that if Smith "had just told [him] that this [was] a school matter," Jarvis testified: "Because it was a school matter and I thought that our police were already involved but I didn't know to what degree." Id.

9

that the group could hear what was being said. The call was made at approximately 4:20 p.m. to 4:30 p.m. When Heller answered the phone, Smith informed him that a student had reported a rape and that the student was at the hospital. Heller told Smith "to contact CPS," Smith indicated that he would, and the call ended. Id. at 180.

At 4:34 p.m., Smith dialed the phone number to reach the DCS-CPS child abuse hotline and placed the call on speaker phone, and Katie Salhoff answered the phone. Sloan identified himself and stated that he was with Muncie Community Schools. Salhoff asked if the caller had called to make a report of child abuse or neglect, and Sloan responded "[w]ell, I'm not sure, but, that is why I called is to let you tell me." Joint Exhibit 3 at 1. Salhoff told Sloan that she would "take down all of the information and then let you know at the end of the report whether or not we would be able to investigate it." Id. Sloan stated "we are working with some other people [and] we just want to make sure we have covered all the bases as a school, we may not even need to speak with you at all." Id. Sloan then stated that Smith was the principal of Muncie Central and would provide all of the details, Salhoff then asked if Smith should be the person that she put as the report source, and Smith answered affirmatively.

Smith then explained that G.G. was a student at the school and had alleged that she had been sexually assaulted by another student in the school building during lunch in a restroom. Smith also stated that G.G. was a resident of the YOC and that both G.G. and S.M. were sixteen years old. Smith indicated that G.G. gave a written statement and that video cameras showed G.G. and S.M. walking down the hall together but did not show them near or in the restroom. When asked if the incident would be reported to law

10

enforcement or the YOC, Smith stated that the school reported it to the YOC and that the YOC picked up G.G. and was going to take her to the emergency room. Smith also indicated that S.M. denied the allegation and that he had called S.M.'s mother to inform her of the discussion with S.M. Salhoff then stated that "[g]iven that the child is 16, this would be something I believe that we would probably refer to law enforcement, I'm not sure if that has been done yet or not," and Smith stated "No." Id. at 6. Salhoff then asked if Smith would like for her to contact the police or if he would like to contact them, and Smith indicated that "We are going to contact them." Id. at 7. Smith also indicated that S.M. had stated that G.G. wrote him a note telling him that she would like to have relations with him. Salhoff then stated: "OK. Like I said, this looks like something we are going to screen out on our end but it is something that we would probably go ahead and forward to law enforcement so if you are saying that is something you guys will do." Id. at 8. Smith answered affirmatively, and Salhoff stated that "this still has to go through two supervisors, so if for some reason it gets screened back in and we do investigate I will give you a call back and let you know about that."[12] Id.

Sloan then called, on speaker phone, Brian Lipscomb, the Chief of Security and Operations for Muncie Central Schools and who had worked for the Delaware County Sheriff's Office for over thirty-seven years, and Lipscomb was informed of the alleged rape at the school. Sloan told Smith, who knew the police were at the hospital and that the rape kit test had not been administered, to get everything together and take it to the police. Lipscomb was surprised that no one from the school corporation was at the

---

[12] Sloan testified that to his knowledge DCS never sent a report to Muncie Central High School following the call to the hotline. A report issued by DCS on November 11, 2010, summarized the call to the hotline and indicated "IS told RS of decision to screen out the report." Joint Exhibit 4 at 2.

hospital with G.G. and immediately drove to the hospital and met with Officer Edwards. Smith also arrived at the hospital and spoke with Lipscomb. Smith gave Officer Edwards a copy of G.G.'s statement and other materials. Smith left the hospital at approximately 6:10 p.m., stating that he needed to attend a school board meeting.

Wallen, the cottage manager where G.G. resided, received a telephone call the following day from Samuels who stated that the school had "come across some letters that implied that [G.G.] had probably not [been] forth coming about the whole situation and she was perhaps eliciting the incident to occur but not a rape obviously." Id. at 158. Wallen went to the school and met with Samuels, Anderson, and Smith. Samuels stated, and Smith agreed, that "they wanted to make sure that they knew that this was what really happened" because it "would destroy the boy[']s reputation." Id. at 160. Wallen did not view any video recordings but Samuels told him that the video showed that, while G.G. wrote in her statement that S.M. had followed her to the bathroom, that actually G.G. was following S.M. Anderson told Wallen that she "had seen girls that had just been raped and [G.G.] didn't act like a girl that had just been raped." Id. at 162.

Officer George Hopper was assigned to investigate the case on November 11, 2010. Officer Hopper interviewed S.M., Ross from the YOC, Smith, and other administrators from Muncie Central Community Schools. At some point, a preliminary examination of G.G.'s clothing indicated positive results for the presence of seminal fluid. Officer Hopper spoke to S.M., and S.M. "[c]hanged his story from one of denial to one of consensual sex." Id. at 306-307. At that point, Officer Hopper did not believe that he had probable cause to arrest S.M. for rape. On November 15, 2010, S.M. confessed to

12

the offense, and Officer Hopper arrested him. S.M. subsequently pled guilty and was incarcerated.[13]

At some point, Officer Hopper opened an investigation for obstruction of justice. Officer Hopper interviewed among others, Smith, Jarvis, Anderson, Samuels, McCowan, Sloan, and Heller. Smith was interviewed on November 19, 2010, and the recording of the interview was labeled as "obs of Justice." See State's Exhibit 4.

PROCEDURAL HISTORY

On March 7, 2011, the State charged Smith with failure to immediately report child abuse or neglect as a class B misdemeanor. Specifically, the information alleged that "on or about November 9, 2010 in Delaware County, State of Indiana, Christopher Smith, a person who had reason to believe that a child may be the victim of child abuse or neglect, did knowingly fail to immediately make a report to the Indiana Department of Child Services or a local law enforcement agency, contrary to the form of the statutes in such cases made and provided by I.C. 31-33-5-1, I.C. 31-33-5-4 and I.C. 31-33-22-1(a) . . . ." Appellant's Appendix at 13. Smith moved to dismiss the information on November 14, 2011, arguing that the statute governing the offense was unconstitutionally void for vagueness, and following a hearing the court denied Smith's motion on January 27, 2012. At the beginning of the bench trial, which was held on March 6 and 7, 2012, the State made an oral motion to amend the charging information by striking the two words "may be" and replacing those words with the word "was," and the court granted the motion. See Transcript at 2-3.

---

[13] Officer Hopper testified that "I believe [S.M.] pled guilty but I'm not sure what charges they were." Transcript at 307.

During trial, the court heard the testimony of McCord, Anderson, Samuels, McCowan, Dunigan, Ross, Wallen, Sloan, Jarvis, Officer Edwards, Lipscomb, Heller, and Officer Hopper. Heller testified that he had been an administrator for forty-six years, that when he received the call from Smith he had advised him to call DCS immediately because he had a duty to report, and that the reason he was alert to the requirement to report was because he had a superintendent friend in another state that did not report child abuse the day of learning about it and had been arrested. Heller testified that Muncie Central had various guidelines and policies for administration, professional staff, and support staff which contained some language related to child abuse and that the language in the guidelines did not define child abuse or neglect. Heller also testified that a pamphlet given to administrators discussed child abuse, which specifically provided that sexual abuse is "[a]ny sexual act between an adult and a child." Defendant's Exhibit A at 5.

Further, McCowan testified that she had received training in previous years on the topic of child abuse and that "almost always it was referenced between an adult and a child." Transcript at 117. When asked whether, as matters were unfolding on November 9, 2010, it occurred to her that one sixteen-year-old sexually assaulting another sixteen-year-old might be considered child abuse, McCowan indicated that it did not occur to her, that the statement of the caseworker on the hotline at 4:30 p.m. that the case would be screened out confirmed her thought, and that Heller's comment to report the case surprised her.

14

McCord testified that she had not received training that a student assaulting another student could be considered child abuse. McCord also indicated that her opinion in November 2010 was that, although S.M. had had minor discipline issues, he was usually honest and that she thought that the accusation of rape was out of character for him based on her prior acquaintance with him. Samuels testified that she did not think that G.G.'s report might be child abuse and "thought of it more as a crime." Transcript at 97. Sloan indicated that, on the day of the assault, he did not think the assault was child abuse. The State admitted the November 19, 2010 police interview of Smith. The court found Smith guilty and sentenced him to 120 days, suspended to probation, and to 100 hours of community service.

ISSUE AND STANDARD OF REVIEW

The issue is whether the evidence is sufficient to sustain Smith's conviction. In a review of a sufficiency of the evidence claim, we do not reweigh the evidence or reevaluate the credibility of witnesses. Rohr v. State, 866 N.E.2d 242, 248 (Ind. 2007), reh'g denied. We view the evidence most favorable to the verdict and the reasonable inferences therefrom and will affirm the conviction if there is substantial evidence of probative value from which a reasonable jury could find the defendant guilty beyond a reasonable doubt. Id.

We also observe that evidence of guilt of substantial and probative value, as required to affirm a conviction on appeal, requires more than a mere scintilla of evidence. Jones v. State, 881 N.E.2d 1095, 1097 (Ind. Ct. App. 2008) (citing Short v. State, 564 N.E.2d 553, 557 (Ind. Ct. App. 1991)). Evidence that only tends to support a conclusion

15

of guilt is insufficient to sustain a conviction, as evidence must support the conclusion of guilt beyond a reasonable doubt. Id. (citing Short, 564 N.E.2d at 557 (citing Vuncannon v. State, 254 Ind. 206, 258 N.E.2d 639 (1970))). Circumstantial evidence must do more than merely tend to arouse suspicion of guilt in order to support a conviction. Id. (citing Marrow v. State, 699 N.E.2d 675, 677 (Ind. Ct. App. 1998)). To the extent that this case requires us to interpret the reporting statutes, we review *de novo* matters of statutory interpretation because they present pure questions of law. Gardiner v. State, 928 N.E.2d 194, 196 (Ind. 2010).

## THE REPORTING STATUTES

Ind. Code § 31-33-22-1(a) provides that "[a] person who knowingly fails to make a report required by IC 31-33-5-1 commits a Class B misdemeanor." Ind. Code § 31-33-5-1 provides that "an individual who has reason to believe that a child is a victim of child abuse or neglect[14] shall make a report as required by this article."

Ind. Code § 31-9-2-101 provides that "'[r]eason to believe', for purposes of IC 31-33, means evidence that, if presented to individuals of similar background and training, would cause the individuals to believe that a child was abused or neglected." Ind. Code § 31-33-5-3 provides that "[t]his chapter does not relieve an individual of the obligation to report on the individual's own behalf, unless a report has already been made to the best of

---

[14] On November 9, 2010, Ind. Code § 31-9-2-133(a) provided in part: "'Victim of child abuse or neglect', for purposes of . . . IC 31-33, refers to a child in need of services as described in: (1) IC 31-34-1-1 through IC 31-34-1-5; (2) IC 31-34-1-10; or (3) IC 31-34-1-11." (2004) (subsequently amended by Pub. L. No. 48-2012 (eff. Jul. 1, 2012) (revising to provide in part that "'Victim of child abuse or neglect', for purposes of . . . IC 31-33, refers to a child as described in: . . . IC 31-34-1-1 through IC 31-34-1-5; . . . regardless of whether the child needs care, treatment, rehabilitation, or the coercive intervention of a court.")). Ind. Code § 31-34-1-3(a) provides that "[a] child is a child in need of services if, before the child becomes eighteen (18) years of age: . . . the child is the victim of a sex offense under: . . . IC 35-42-4-1 [rape]" and "the child needs care, treatment, or rehabilitation that: (A) the child is not receiving; and (B) is unlikely to be provided or accepted without the coercive intervention of the court."

16

the individual's belief." Ind. Code § 31-33-5-4 provides that "[a] person who has a duty under this chapter to report that a child may be a victim of child abuse or neglect shall immediately make an oral report to [] the department; or [] the local law enforcement agency."

In addition, Ind. Code § 31-33-6-1 provides:

Except as provided in section 2 of this chapter, a person, other than a person accused of child abuse or neglect, who:

    (1)    makes or causes to be made a report of a child who may be a victim of child abuse or neglect;

                * * * * *

    (3)    makes any other report of a child who may be a victim of child abuse and neglect; …

                * * * * *

is immune from any civil or criminal liability that might otherwise be imposed because of such actions.

Ind. Code § 31-33-6-2 provides that "[i]mmunity does not attach for a person who has acted maliciously or in bad faith." Ind. Code § 31-33-6-3 provides that "[a] person making a report that a child may be a victim of child abuse or neglect or assisting in any requirement of this article is presumed to have acted in good faith."

ARGUMENTS OF COUNSEL

Smith contends that the evidence was insufficient to support the elements of the offense and requests this court to reverse his conviction. Specifically, Smith argues that the State failed to prove that he had "reason to believe," as defined by Ind. Code § 31-9-2-101 and required by Ind. Code § 31-33-5-1, that G.G. was a victim of child abuse.

17

Smith argues that a victim of child abuse is distinct from a victim of a crime, for which no duty to report is mandated by a criminal statute. Smith points to evidence showing that there were five individuals of similar background and training involved in the events as they played out over the four hours between G.G.'s report at 12:20-12:25 p.m. and the call to the CPS hotline at 4:34 p.m., that Sloan and McCowan were administrators holding more senior positions than Smith and were Smith's superiors, that Sloan and McCowan occupied positions responsible for the school's policies and neither believed that an allegation by one sixteen-year-old against another was child abuse, and that when Smith, Sloan and others called the CPS hotline Sloan stated that he was unsure if the call was regarding child abuse. Smith argues that each of the five other mid-level school administrators holding positions comparable to Smith's position who testified at his trial indicated that they did not consider that a student-on-student matter could be child abuse.

Smith further maintains that it is illuminating that for the first three weeks the police investigation was for obstruction of justice, not failure to report child abuse, and that Officer Hopper never asked Smith during the November 19, 2010 interview whether he realized what happened might be child abuse because the police were not investigating child abuse or a failure to report it and inferentially did not realize at that time that G.G.'s allegations might constitute child abuse. Smith argues that the statutory test speaks in terms of training, and the evidence was undisputed that the administrators had received training from a booklet which described child abuse of a sexual nature as a sexual act between an adult and a child. Smith also asserts that the DCS hotline worker did not perceive the report to relate to child abuse and "screened it out" due to the age of the

18

parties. Smith argues that DCS was required by law to send the school a report, which it did not do and which provides further proof that DCS did not consider Smith's report of a forcible sexual assault between two sixteen-year-olds to be child abuse. Smith maintains that the evidence was undisputed at trial that individuals with similar training and experience as Smith, as well as DCS and police, did not immediately recognize that the assault might be child abuse.

Smith further argues that the evidence was undisputed that he caused notice of the assault to be given to the YOC, the institution where G.G. had been placed, within minutes of learning of the assault, that the YOC in turn immediately notified DCS through G.G.'s caseworker, that DCS received notification within forty minutes of Smith's knowledge of the assault, and that these events satisfied any duty to report as a matter of law. Smith also argues that the evidence established that he made an oral report to a DCS hotline four hours after learning of the allegation.

Smith also contends that the evidence shows that his action to report was sufficiently contemporaneous to comply with the immediacy element of the statute. He maintains that his counsel "has diligently reviewed the reported decisions from across the country that detail the facts of prosecutions for failure to report child abuse," that "*no case* presents facts anywhere close to this one – a prosecution for failure to report within four hours," that "[a]ll deal with failures that extended over extended periods of time," that "a true effort to conceal abuse despite clear knowledge of its occurrence . . . is the evil these statutes seek to prevent," and that such conduct was not present in this case. Appellant's Brief at 32. Smith argues that although the reporting statute does not define

the term "immediately," the two state agencies most heavily involved in child abuse reporting and investigation, DCS and the Department of Education, have delineated a boundary of twenty-four hours for what constitutes "immediately" in the context of investigating child abuse in the case of DCS or reporting medical emergencies in the case of the Department of Education, that such an interpretation is reasonable and fair, and that "certainly the state permits a citizen some time to assess and reflect before he reports, without penalty of being labeled a criminal and having his job and license in peril." Id. at 33-34.

Smith asserts that administrators were faced with three distinct possibilities on November 9th, namely, that G.G.'s report was truthful, that S.M.'s denial was truthful, or that the two had a consensual encounter, and Smith argues that none of the educators at the school that day believed that G.G. was a victim of child abuse. Smith also argues that the legislature's purposes and goals of the reporting statutes, which include in part to encourage effective reporting and to provide effective child services to quickly investigate reports, protection for abused children, and rehabilitative services, were adequately served by a report within four hours under circumstances such as in this case.

The State argues that the evidence is sufficient to support Smith's conviction. The State asserts in part that a common-sense reading of the statutes would have informed anyone of ordinary intelligence that Smith's duties depended on his knowledge of information, events and circumstances that would cause a person of similar background and training to believe that G.G. had been raped.

The State contends that Smith's attempt to argue that "he cannot be guilty unless he confessed or one of his co-workers accused him is without merit," that "Section 31-9-2-101 defines 'reason to believe' without reference to the individual's subjective opinion or perception," and that "[t]he section imposes an objective test." Appellee's Brief at 12-13. The State's position is that "[t]he purpose of Section 31-9-2-101's inclusion of training and background is to gauge the duty to report according to the training and background of the individual with knowledge of the facts," that "[t]he state's baseline test is a person of ordinary background and training," and that "[t]he Legislature's intention is not to hold laymen to the standard of experts, or exempt experts from the duty of laymen; the Legislature intended to require that individuals act reasonably in their circumstances." Id. at 13-14. The State asserts that "Smith's contrary interpretation, that he can only be guilty if his co-workers agreed that abuse had occurred, or if DCS had initiated its own investigation, is another nonsensical consequence that this Court should reject." Id. at 14.

The State further argues that "[t]his Court should reject Smith's invitation to reinterpret the statute's requirement of immediacy to allow up to twenty-four hours to mull things over before deciding whether to report the abuse," that "[t]here is no warrant for this interpretation in the statute's plain language," that the legislature may distribute duties and define crimes as it sees fit, and that the legislature reasonably determined that "it may require more time to organize an 'appropriately thorough child protection assessment' than it does to dial a telephone and communicate existing belief." Id. at 15.

The State also says that Smith's duty to report was not vicariously fulfilled by Samuels' call to the YOC, that Smith does not identify any provision in the placement

21

agreement which delegate's DCS's duty to receive reports of abuse and neglect to the YOC, and that the YOC was not DCS's agent for purposes of reporting G.G.'s abuse. The State argues that Smith had a duty to report the rape after he reviewed G.G.'s written statement and that his subsequent actions, which were intended to find a reason not to report the abuse, do not exonerate him from his duty to report the rape. The State also argues that "[t]aken most favorably to the verdict, . . . the evidence supports the conclusion that Smith's actions were a studied attempt to avoid acting on the belief that [G.G.] had been raped and to ensure that if the rape were reported, the report would be made away from school property and/or by persons who were not connected to the school," that "Smith sought to intimidate [G.G.] by ordering her to make a written statement," that "Smith declined to ask nurse Anderson about [G.G.'s] condition, even after Smith had read [G.G.'s] written statement," that "Smith ordered the unprecedented action of having a disciplinary referral prepared against [G.G.]," that "Smith flatly refused to inform police when asked by Samuels, and again after Jarvis suggested it." Id. at 25. The State argues that "it is undeniable that Smith's actions represent only his own desire that a report of the rape or an arrest for the rape not be connected to the school." Id. at 26.

In his reply brief, Smith argues that the crux of the State's argument is that if Smith had knowledge that G.G. may have been the victim of rape, that knowledge alone triggered the duty to report. Smith argues that failure to report rape is not a crime and that the legislature's inclusion of the language of "similar background and training"

22

makes relevant any evidence of how similarly situated persons perceived information and events. Appellant's Reply Brief at 6.

DISCUSSION AND ANALYSIS

To the extent we must consider the statutes set forth at Ind. Code § 31-33-22-1, Ind. Code § 31-33-5 and 6, and Ind. Code § 31-9-2-101, the primary purpose of statutory interpretation is to ascertain and give effect to the legislature's intent. State v. Lynch, 961 N.E.2d 534, 537 (Ind. Ct. App. 2012) (citing Gunn v. State, 956 N.E.2d 136, 139 (Ind. Ct. App. 2011)). A statute should be examined as a whole, avoiding excessive reliance upon a strict literal meaning or the select reading of individual words. Id. (citing Prewitt v. State, 878 N.E.2d 184, 186 (Ind. 2007)). We presume that the legislature intended for the statutory language to be applied in a logical manner consistent with the statute's underlying policy and goals. Id. at 537-538.

The legislature is presumed to have intended the language used in the statute to be applied logically and not to bring about an unjust or absurd result. Sales v. State, 723 N.E.2d 416, 420 (Ind. 2000). We seek to give a statute practical application by construing it in a way favoring public convenience and avoiding absurdity, hardship, and injustice. Hampton v. State, 921 N.E.2d 27, 30 (Ind. Ct. App. 2010) (citing Merritt v. State, 829 N.E.2d 472, 474 (Ind. 2005)), reh'g denied, trans. denied. In addition, we conventionally construe penal statutes strictly against the State. Sales, 723 N.E.2d at 420; Hyche v. State, 934 N.E.2d 1176, 1178-1179 (Ind. Ct. App. 2010) ("We must also strictly construe penal statutes against the State to avoid enlarging them beyond the fair meaning of the language used.") (citation omitted), reh'g denied, trans. denied.

23

Ind. Code § 31-33-1-1 provides that the purpose of the article is to: (1) encourage effective reporting of suspected or known incidents of child abuse or neglect; (2) provide effective child services to quickly investigate reports of child abuse or neglect; (3) provide protection for an abused or a neglected child from further abuse or neglect; (4) provide rehabilitative services for an abused or a neglected child and the child's parent, guardian, or custodian; and (5) establish a centralized statewide child abuse registry and an automated child protection system.

We observe that Ind. Code § 31-33-5-1 requires an individual "who has reason to believe that a child *is* a victim of child abuse" to make a report. (Emphasis added). Further, the amended charging information alleged that Smith had reason to believe that G.G. "was" (and not that G.G. may have been) a victim of child abuse. We also observe that the phrase "reason to believe" under Ind. Code § 31-9-2-101 "means evidence that, if presented to individuals of similar background and training, would cause the individuals to believe that a child was abused or neglected." We note that the school administrators assisting Smith and the school after G.G. reported her allegations to McCord testified at trial, and that McCord, McCowan, Samuels, and Sloan each specifically testified that his or her opinion on November 9, 2010 was that a sexual assault by a sixteen-year-old student against another sixteen-year-old student was not child abuse. Further, Heller testified that the guidelines or policies of the school did not contain a definition of child abuse and that a pamphlet referred to sexual abuse as any sexual act between an adult and a child. McCowan and McCord gave similar testimony regarding their training. At the time of the call by Smith, Sloan, McCowan, and Samuels to the DCS-CPS child abuse

24

hotline, Sloan was unsure whether the assault involving G.G. was child abuse. Salhoff, after learning the details of G.G.'s allegations from Smith, indicated that the case "look[ed] like something we are going to screen out on our end." Joint Exhibit 3 at 8.

The evidence shows that G.G. told McCord that she had been raped between 12:20 and 12:25 p.m.; that Smith spoke with Samuels at 12:38 p.m. and instructed her to call the YOC; that Samuels called the YOC at approximately 12:40 or 12:45 p.m.; that as a result of the call Dunigan contacted Annette at DCS soon after 1:00 p.m. and reported the incident; that the YOC arranged to transport G.G. to the emergency room; that Anderson stayed with G.G. at the school while waiting for Ross with the YOC to arrive; that between 12:45 and 1:00 p.m., Smith attempted to contact Assistant Superintendent Heller but was transferred to McCowan, the Director of Secondary Education, and Smith reported G.G.'s allegations; that Smith and Jarvis questioned S.M.; that Ross arrived at approximately 2:00 p.m. and transported G.G. to the hospital and that there was a delay in examining G.G. at the hospital because an assault nurse was not initially available; that the hospital staff called the Muncie Police at 3:25 p.m. and that officers arrived at the hospital by 3:55 p.m.; that Smith called Ross and asked whether the school or the YOC was going to file a report; and that at approximately 4:34 p.m. Smith, together with Sloan, McCowan, and Samuels called the DCS-CPS hotline.

Thus, the evidence shows that Smith directed Samuels to notify the YOC within twenty minutes of learning of the assault, that Annette with DCS was notified of the assault soon after 1:00 p.m. as a result of Samuels' call to the YOC, that Smith, together with or relying in part upon the statements of Anderson, the school's medical

25

professional, and Assistant Principal Samuels, questioned the truth of G.G.'s allegations because they believed that G.G. had previously faked a seizure, that Smith and Jarvis questioned S.M., that police were at the hospital by 3:55 p.m., and that, following the conference call with Heller, Smith together with Sloan, McCowan, and Samuels called the DCS-CPS hotline, which was approximately four hours after Smith initially learned of G.G.'s report.

Although Smith and the other school administrators may have participated in other administrative activities during the four-hour period such as the previously-scheduled interviews, the evidence does not show that Smith ignored the alleged assault involving G.G. but rather that he had Samuels contact the YOC which in turn immediately notified DCS and made arrangements to transport G.G. to the hospital, questioned S.M., and continued to discuss the incident with the other school administrators before and after the call to the hotline. We also note that Ind. Code § 31-33-6-1 provides immunity from criminal liability for a person who "*makes or causes to be made* a report" of child abuse, that immunity does not attach for a person who has acted maliciously or in bad faith under Ind. Code § 31-33-6-2, and that a person making a report or "assisting in any requirement of this article *is presumed to have acted in good faith*" under Ind. Code § 31-33-6-3. (Emphases added). An allegation that an individual has engaged in child abuse is a serious claim, and a reasonable investigation made in good faith of such an allegation prior to making a report is not improper and does not deprive the person required to make such a report of statutory immunity. See Phillips v. Behnke, 531 N.W.2d 619, 623 (Wis. Ct. App. 1995) ("An allegation that an individual has engaged in improper sexual

26

behavior with a child is extremely damaging both to the individual's reputation and career. Accordingly, investigating the reasonableness of one's belief that a teacher has engaged in sexual misconduct prior to making a report is proper and does not deprive the individual of immunity.").

The State needed to present evidence which proved the charged offense beyond a reasonable doubt, and not merely present facts which tend to arouse suspicion of guilt, in order to support a conviction and show that Smith had reason to believe, as defined by the Legislature, that G.G. was a victim of child abuse and that Smith then knowingly failed to immediately report such abuse. Based upon the evidence presented at Smith's trial, and keeping in mind that we must strictly construe penal statutes against the State, we conclude that under these specific circumstances there is insufficient evidence of probative value from which the trier of fact could reasonably have found beyond a reasonable doubt that Smith committed the offense charged. Accordingly, we reverse and vacate Smith's conviction for failure to immediately report child abuse as a class B misdemeanor. See Aguirre v. State, 953 N.E.2d 593, 597 (Ind. Ct. App. 2011) (reversing the defendant's conviction and concluding that there was insufficient evidence of probative value from which the trial court could reasonably have found beyond a reasonable doubt that the defendant committed the charged offense), trans. denied; Phillips, 531 N.W.2d at 622-623 (noting that the respondents conducted a preliminary investigation to verify the allegations before reporting the allegations to the proper authorities, rejecting the suggestion that reasonable attempts at verification deprive a reporter of immunity under the relevant statute, and concluding that expending a

27

reasonable amount of time to verify a child's allegation of sexual misconduct is consistent with the statute's requirement that such information be reported immediately).

CONCLUSION

For the foregoing reasons, we reverse with instructions to vacate Smith's conviction for failing to immediately report child abuse or neglect as a class B misdemeanor under Ind. Code § 31-33-22-1.

Reversed.

BAILEY, J., concurs.

VAIDIK, J., dissents with separate opinion.

# IN THE
# COURT OF APPEALS OF INDIANA

CHRISTOPHER SMITH, )
)
    Appellant-Defendant. )
)
          vs. )     No. 18A02-1204-CR-331
)
STATE OF INDIANA, )
)
    Appellee-Plaintiff. )

**VAIDIK, Judge, dissenting.**

I respectfully dissent from the majority's decision to vacate former Muncie Central High School principal Christopher Smith's conviction for failing to report child abuse. I would find that Smith had reason to believe that sixteen-year-old G.G. was a victim of child abuse and failed to immediately report the abuse.

On November 9, 2010, sixteen-year-old G.G. told a Muncie Central employee, Kathaleena McCord, that another student at the school, sixteen-year-old S.M., had raped her in the boys' bathroom during lunch that day. G.G. told McCord this around 12:20 p.m. or 12:25 p.m. An informal, four-hour investigation of G.G.'s allegation then began, conducted by a number of school employees—McCord, former associate principal Jackie Samuels, and school nurse Trudy Anderson—all spearheaded by Smith. Witnesses would later testify that Smith and the other Muncie Central employees had investigated G.G.'s

29

allegations because she had faked a seizure in the past and therefore believed she might be lying about the rape and because they wanted to protect S.M.'s reputation.

Smith began the investigation by requiring G.G. to give him a written statement of her allegations. After she did so, Smith read her statement and asked G.G. questions. Smith interviewed S.M. and told the school's athletic director to search S.M. and G.G.'s lockers. Smith also instructed McCord to look for any video footage of S.M. and G.G. in the school hallways that day. In addition, Smith sought advice on how to proceed from numerous school officials. All the while, G.G. remained in McCord's office; S.M. was allowed to go home. G.G. was eventually taken to the local hospital for a sexual-assault examination, which confirmed her allegations. S.M. later admitted that he raped G.G. and pled guilty to sexual battery and criminal confinement.

Because G.G. had been adjudicated a CHINS and removed from her home years earlier, the Department of Child Services ("DCS") had placed G.G. in a residential program at the Youth Opportunity Center ("YOC") in Delaware County. G.G. was still living at the YOC in November 2010. Shortly after G.G. reported the rape, Smith told Samuels to call the YOC. Samuels did so at approximately 12:40 or 12:45 p.m. Although Samuels made this initial call to the YOC, no one from Muncie Central contacted DCS or any other authority to report G.G.'s allegations until 4:34 p.m., when Assistant Superintendent Tim Heller verbally instructed Smith to call the child-abuse reporting hotline.

On appeal, Smith contends that he had no reason to believe that G.G. was a victim of child abuse such that he was required to make a report. Smith also argues that,

nonetheless, he did immediately report the abuse by virtue of Samuels' 12:40 or 12:45 p.m. call to the YOC. The majority accepts Smith's arguments. I believe that doing so disregards the evidence most favorable to the judgment and undermines Indiana's child-abuse reporting statute. Further, the majority cites with approval case law from other jurisdictions that permits verification of a child's allegations of abuse before making a report. I believe such a verification process is contrary to statute and, if permitted, may have the highly undesirable result of suppressing or deterring reports of abuse.

Indiana Code section 31-33-5-1 requires "an individual who has reason to believe that a child is a victim of child abuse or neglect to make a report as required by this article."[15] The reporting statute provides that "reason to believe . . . means evidence that, if presented to individuals of similar background and training, would cause the individuals to believe that a child was abused or neglected." Ind. Code § 31-9-2-101. If a person has reason to believe that abuse or neglect has occurred, they "shall immediately make an oral report to [] the department; or [] the local law enforcement agency." Ind. Code § 31-33-5-4. A person who fails to immediately report child abuse commits a Class B misdemeanor. Ind. Code § 31-33-22-1(a).

Smith argues that he did not have reason to believe that G.G. was a victim of child abuse. His primary argument in support of this claim is that he consulted many school officials about G.G.'s allegations, none of whom believed that G.G.'s allegations constituted child abuse because two children were involved. The majority seems to accept this argument, noting school employees' testimony to this effect and the fact that

---

[15] Although this Chapter does not define "child," Chapter 24 and 25 of this Article define "child" as "an individual less than eighteen (18) years of age." Ind. Code §§ 31-33-24-1, 31-33-25-1.

Muncie Central's guidelines and policies did not define child abuse, though "a pamphlet" referred to "sexual abuse" as "any sexual act between an adult and a child." Slip op. at 26. But this ignores the common-sense conclusion that when a child is the victim of abuse—regardless of the age of the perpetrator—the act is abuse of a child. Moreover, one expressly stated goal of the reporting statute is the protection of children. *See* Ind. Code § 31-33-1-1(3) ("The purpose of this article is to [] provide protection for an abused or a neglected child from further abuse or neglect . . . ."). A child is no less in need of protection from further abuse simply because his or her abuser is also a child. The evidence most favorable to the judgment shows that a child, G.G., alleged that she had been raped. I would find that Smith had reason to believe G.G. was a victim of child abuse.

I would also find that Smith failed to immediately report the abuse. Smith claims that he directed Samuels to contact the YOC at approximately 12:40 or 12:45 p.m., and this constitutes an immediate report to DCS. I disagree. G.G. was a ward of DCS living at the YOC. Smith, Samuels, and other witnesses testified that the YOC was contacted because it was, in essence, G.G.'s parent or guardian and had to give permission for G.G. to receive medical care. Notifying a parent or guardian of abuse allegations, even for the purpose of obtaining permission to seek medical treatment for a victim, does not amount to reporting allegations of abuse to authorities. And to the extent Smith argues that the YOC was DCS's agent for reporting purposes, I would also disagree. The record does not establish that the YOC assumed DCS's statutorily mandated duty to receive and investigate reports of abuse or that the YOC indicated as much to Smith or Samuels.

32

Because Samuels' call to the YOC did not constitute a report, the relevant report did not occur until 4:34 in the afternoon, when Smith called the child-abuse reporting hotline. I do not believe this report, made nearly four hours after G.G. said she had been raped, can be called immediate.

Although this Court has yet to define the term "immediate" in the child-abuse reporting context, I would consider the following factors in determining whether a report was made immediately: (1) the identity of the person to whom the victim reports abuse; (2) the impact any delay in reporting the abuse to the authorities might have on evidence of the alleged crime; (3) the length of time between the victim's report and the report to authorities; and (4) the circumstances of any delay in reporting. Here, G.G. reported the incident to her high-school principal, Smith, shortly after she was raped at the high school. Instead of reporting this incident immediately to law-enforcement authorities or DCS, Smith took it upon himself to investigate G.G.'s report. Critical evidence could have been lost during this time frame as the location of the rape, a boys' bathroom, was not secured, G.G.'s attacker was allowed to go home, and G.G.'s sexual-assault examination at a local hospital was potentially delayed. The fact that S.M. ultimately admitted that he attacked G.G. does not change the fact that important evidence could have been lost during this time period. Despite the relatively short time frame, four hours, between G.G.'s report to Smith and Smith's eventual report to DCS, the circumstances viewed in a light most favorable to the judgment support the conclusion that Smith failed to immediately report G.G.'s abuse to the proper authorities.

Because what occurs—or does not occur—immediately after an allegation of abuse is so critical, I respectfully disagree with the majority's approval of case law from another jurisdiction that permits the verification of abuse before reporting that abuse to authorities. *See* Slip op. at 28-29. Allowing such a verification process undermines the purpose of the statute, which is to encourage, rather than discourage the reporting of suspected abuse and, in turn, ensure an impartial investigation. Ind. Code §§ 31-33-1-1(1), 31-33-1-1(2).

This case exemplifies the dangers of sanctioning a verification process. Here, school officials thought G.G. might be lying about the attack and wanted to protect the reputation of her attacker. Undoubtedly school officials also had an interest in protecting Muncie Central's reputation as a safe environment, not an environment where rape occurs during school hours. The internal investigation was hardly in the hands of unbiased and impartial investigators.

By requiring that reports of abuse be made to DCS or the proper authorities, the reporting statute aims to prevent a situation in which individuals familiar with an alleged victim or abuser, or otherwise invested in the situation, conduct an informal investigation shaped by bias or improper motives. The consequences of a tainted investigation are high—evidence may be lost with the passage of time, allegations may be suppressed, and victims may be reluctant to report abuse. For all of the above reasons, I respectfully dissent and would affirm the judgment.