ATTORNEYS FOR APPELLANT
Scott E. Shockley
James R. Williams
Muncie, Indiana

ATTORNEYS FOR APPELLEE
Gregory F. Zoeller
Attorney General of Indiana

Ian A.T. McLean
Deputy Attorney General
Indianapolis, Indiana

# In the
# Indiana Supreme Court

**FILED**
Mar 27 2014, 9:41 am

**CLERK**
of the supreme court,
court of appeals and
tax court

No. 18S02-1304-CR-297

CHRISTOPHER SMITH,

*Appellant (Defendant below),*

v.

STATE OF INDIANA,

*Appellee (Plaintiff below).*

Appeal from the Delaware Circuit Court, No. 18C05-1103-CM-01
The Honorable Thomas Cannon, Judge

On Petition to Transfer from the Indiana Court of Appeals, No. 18A02-1204-CR-331

**March 27, 2014**

**David, Justice.**

The Indiana Code requires certain school officials to immediately report instances of suspected child abuse occurring within their institutions to the Department of Child Services or law enforcement. Here, a high school principal was convicted for failing to comply with this requirement after a student at his school told him she had been raped by a fellow student, and he did not notify the police or the Department of Child Services for four hours. We affirm.

**Facts and Procedural History**

G.G. was a sixteen-year-old student at Muncie Central High School. G.G. had previously been found to be a child in need of services and made a ward of the Madison County office of the Indiana Department of Child Services. She resided, by court order, at the Youth Opportunity Center in Muncie. The YOC served as G.G.'s custodial parent and provided care, room, and board to G.G. pursuant to a contract with DCS.

Between 12:20 and 12:25 p.m. on November 9, 2010, a fellow student brought G.G. to the office of Kathy McCord, the assistant principal at Muncie Central. G.G. told McCord that she had been raped (during lunch) by a fellow student, S.M., in a bathroom at the school. McCord immediately went to the office of Christopher Smith, then the principal at Muncie Central, and told him of the rape allegation.

Smith and McCord returned to McCord's office, where G.G. repeated the allegation. Smith contacted Trudy Anderson, the school nurse, at approximately 12:40, and also Jackie Samuels, the associate principal, informing them of the allegation and asking them to come to McCord's office. Anderson went into McCord's office to sit with G.G., and Smith, Samuels, and McCord went to Smith's office. Smith directed McCord to review the school's security footage to identify the whereabouts of the two students—a process that took McCord about an hour. Anderson sat with G.G. until McCord returned, and at some point during that time G.G. was directed to provide a handwritten statement of her allegation, which she did.

At the time, there were between three and five commissioned and sworn police officers on school grounds, serving as security officers. Samuels asked Smith if she should contact one of those officers, call the YOC, or find S.M. Smith directed her to call the YOC. Samuels spoke on the phone with Crystal Dunigan, a staff member at the YOC responsible for G.G.'s cottage, and informed her of the alleged rape. Dunigan asked Samuels to call back, because Dunigan needed to talk to other individuals at the YOC.

Sometime between 12:45 and 1:00, Smith called the administration for the Muncie Community School District and spoke to the director of secondary education, Joann McCowan. Smith was trying to reach Tim Heller, the assistant superintendent. Smith relayed G.G.'s allegation to McCowan, and said his question for Heller was whether a security officer should be present if S.M. was questioned. McCowan reached the district's director of human resources, Lon Sloan, who told her that Smith should have another administrator present, but did not need a security officer as they were not sure if it was a criminal matter or not. Both McCowan and Sloan were headed to Muncie Central later that afternoon for job interviews.

Samuels called Dunigan a second time, shortly before 1:00. Dunigan explained that the YOC would send a driver to take G.G. to the emergency room. The two also discussed G.G.'s credibility, including an incident earlier that year in which Anderson believed G.G. had faked a seizure, and an attendance issue in which G.G. lied about where she had been. After the conversation concluded, Samuels told Smith that the YOC was coming to take G.G. to the emergency room.[1]

Smith then directed Samuels, at about 1:25, to go get S.M.—who had spent the intervening time finishing lunch and then attending a science class—and bring him to Smith's office. Smith asked the Muncie Central athletic director, Thomas Jarvis, to be a witness while he questioned S.M. Jarvis asked Smith if this should be a police matter instead, but Smith said that it was still a school matter.

Smith questioned S.M. about the allegation, but S.M. denied raping G.G. He was not asked to provide a written statement. The questioning last between fifteen and twenty minutes,

---

[1] The YOC driver, Tameka Ross, arrived at a little before 2:00. Ross and G.G. arrived at Ball Memorial Hospital in Muncie at around 2:30. Within about an hour, the hospital's staff contacted the police to report the possible sexual assault, and officers arrived at the hospital just before 4:00.

and S.M. was then allowed to return to his class and—at the end of the school day—eventually went home.

After S.M. left, Smith asked Jarvis to search S.M.'s and G.G.'s lockers. S.M. indicated during the questioning that he and G.G. had exchanged several notes, but that he had thrown them away; but Jarvis and Smith believed the letters would still be in the students' lockers. Jarvis contacted one of the school's security officers, Officer Mike Edwards of the Muncie Police, and asked him for assistance in the search. Jarvis did not, however, tell Officer Edwards that there had actually been an allegation of a rape occurring on school grounds—nor did anyone else at the school.

After completing the search, Officer Edwards continued his normal duties until 3:30, when he left the school for the day. Later that afternoon, Officer Edwards's supervisor with the police department informed him of the rape, and that it had occurred at Muncie Central. Officer Edwards immediately went to Ball Memorial. He served as the lead investigator briefly, before another officer—Detective George Hopper—assumed that function two days later.

Meanwhile, back at Muncie Central, Samuels, Smith, Sloan, and McCowan proceeded to conduct interviews with candidates for an open administrator position. The interviews lasted until after 4:00.

At the conclusion of the second interview, Sloan realized that Heller and the superintendent for the district, Dr. Eric King, still had not yet been notified of the alleged rape. With Sloan and McCowan in the room, Smith then called Heller. Smith explained to Heller that G.G. had reported that she had been raped, and that she was then at the hospital. Heller told Smith to contact DCS.

A little after 4:30, Sloan placed a call to the Indiana Child Abuse Hotline, operated by DCS. Smith then explained the circumstances of G.G.'s allegations to the hotline operator, who indicated that because S.M. was also sixteen, "this would be something I believe that we would

4

probably refer to law enforcement," and that "this looks like something we are going to screen out on our end," but she would forward the report to her supervisors. (Joint Ex. 3 at 1, 6, 8.) Smith told the operator that he would contact law enforcement.

Smith then tried several times to contact the YOC to check on G.G., before finally getting ahold of Ross at the hospital, sometime between 4:30 and 4:50. The rape kit had not yet been completed at that time, and Smith asked Ross if the YOC intended to report the allegation, or if Muncie Central should do it. Ross replied that she assumed Muncie Central should make the report, as the rape occurred at the school.

Sloan then called the district's chief of security and operations, Brian Lipscomb, and asked—hypothetically—what Lipscomb's response would be if a student were sexually assaulted at school. Lipscomb responded that he would call the police. Sloan then informed Lipscomb of G.G.'s allegations, and that she was now at Ball Memorial. Lipscomb immediately went to the hospital, where he met with Officer Edwards, and Smith arrived there at about 5:30. Smith remained until about 6:10 and then left for a school board meeting, because he was recognizing several coaches and the volleyball team at the meeting. Lipscomb remained for about another thirty minutes—until G.G. was taken back to the YOC. At no point did Smith, Muncie Central, or the district ever directly contact the Muncie Police Department to report the rape.

On November 11, Detective Hopper began his investigation into the alleged rape. Six days into the investigation, S.M. admitted to raping G.G., and he was arrested and later pleaded guilty.[2] At a point, however, the investigation shifted focus to Smith; why he did not contact the police at all—or DCS sooner—after G.G. informed him of the rape, and why district officials

---

[2] The precise charge(s) S.M. faced, the charge(s) to which he pleaded guilty, and his sentence are not available from the record. We can assume he was charged as an adult, though, because our juvenile courts do not have jurisdiction over a sixteen-year-old alleged to have committed rape. See Ind. Code § 31-30-1-4(a)(4) (2008).

were then claiming G.G. had recanted, been vague in her accusation, or somehow changed her story over the course of the day. Smith told police he assumed that notifying the YOC and getting G.G. to the hospital would take care of the police notification.

The State eventually charged Smith with failure report G.G.'s allegation to DCS or local law enforcement, a class B misdemeanor under Indiana's statutory scheme requiring school officials to report instances of child abuse.[3] Ind. Code § 31-33-22-1(a) (2008). Smith filed a motion to dismiss the charges, claiming the State had inappropriately combined the reporting requirements of two statutes, and also arguing that the reporting statute was void for vagueness. The trial court denied Smith's motion and affirmed the constitutionality of the criminal provision, but amended the charging information to cure Smith's claim that the information inappropriately combined two statutory provisions.[4] Smith was convicted following a bench trial, sentenced to 120 days in jail, all suspended to probation, ordered to serve one hundred hours of community service, and also ordered to pay a fine of one hundred dollars along with court and probation costs.

Smith appealed, claiming the evidence was insufficient to sustain his conviction and also reiterating his claim that the criminal statute was unconstitutionally vague. In a split opinion, the Court of Appeals reversed and vacated Smith's conviction. Smith v. State, 982 N.E.2d 348, 363 (Ind. Ct. App. 2013).

Without needing to reach the question of the statute's constitutionality, the majority concluded that the State failed to present sufficient evidence that Smith had reason to believe

---

[3] The case was initially opened as an obstruction of justice investigation. See Ind. Code §§ 35-44-3-4 (2008), 35-44.1-2-2 (Supp. 2013) (effective July 1, 2014).

[4] The statutory provisions—and the nature of this amendment to the charging information—are discussed in greater detail below.

G.G. had been a victim of child abuse as required by the reporting statute, because neither he nor his fellow administrators believed that a student-on-student rape was child abuse as defined by the Indiana Code, and it also interpreted the statutory scheme to permit a reasonable investigation made in good faith.  Id. at 362–63.  Judge Vaidik dissented, believing that the majority's interpretation of the reporting requirements to first allow a reasonable investigation undermined the purpose behind the statutory scheme and might operate to discourage, rather than encourage, the reporting of child abuse.  Id. at 363–66 (Vaidik, J., dissenting).

We granted transfer, thereby vacating the Court of Appeals opinion.  Smith v. State, 987 N.E.2d 70 (Ind. 2013) (table); Ind. Appellate Rule 58(A).

**Criminal Liability Under Indiana's Child Abuse Reporting Statutes**

Indiana Code article 31-33 contains a statutory structure to govern the reporting and investigation of child abuse and neglect.  The structure's purpose is to:

> (1) encourage effective reporting of suspected or known incidents of child abuse or neglect;
> (2) provide effective child services to quickly investigate reports of child abuse or neglect;
> (3) provide protection for an abused or a neglected child from further abuse or neglect;
> (4) provide rehabilitative services for an abused or a neglected child and the child's parent, guardian, or custodian; and
> (5) establish a centralized statewide child abuse registry and an automated child protection system.

Ind. Code § 31-33-1-1 (2008).  In furtherance of those aims, the statutes in this article provide that "an individual who has reason to believe that a child is a victim of child abuse or neglect shall make a report as required by this article."  Ind. Code § 31-33-5-1 (2008).  If the individual is "a member of the staff of a medical or other public or private institution, school, facility, or agency, the individual shall immediately notify the individual in charge."  Ind. Code § 31-33-5-

7

2(a) (2008). That "individual in charge . . . shall report or cause a report to be made." Ind. Code § 31-33-5-2(b). The report must be made "immediately . . . to: (1) the department [DCS]; or (2) the local law enforcement agency." Ind. Code § 31-33-5-4 (2008).

An individual has "reason to believe" a child is a victim of child abuse or neglect when the individual is presented with "evidence that, if presented to individuals of similar background and training, would cause the individuals to believe that a child was abused or neglected." Ind. Code § 31-9-2-101 (2008). And at the time of the incident here, a "victim of child abuse or neglect" was defined in relevant part as "a child described in: (1) IC 31-34-1-1 through IC 31-34-1-5." Ind. Code § 31-9-2-133(a) (2008).[5]

That range of statutory provisions—"IC 31-34-1-1 through 31-34-1-5"—establishes the fixed set of circumstances under which a child might be found to be a child in need of services, or CHINS. Of those circumstances, section 31-34-1-3 applies here, as it provides that

> (a) A child is a child in need of services if, before the child becomes eighteen (18) years of age:
> (1) the child is a victim of a sex offense under:
>     (A) IC 35-42-4-1;
>
> * * *
>     and
> (2) the child needs care, treatment, or rehabilitation that:
>     (A) the child is not receiving; and
>     (B) is unlikely to be provided or accepted without the coercive intervention of the court.

---

[5] Similarly, "child abuse or neglect," for purposes article 31-33, referred to "a child who is alleged to be a child in need of services as described in IC 31-34-1-1 through IC 31-34-1-5." Ind. Code § 31-9-2-14(a) (2008).

Ind. Code § 31-34-1-3(a) (2008).[6] And, finally, the relevant portion of Indiana Code § 35-42-4-1—the criminal provision for rape—defines that offense as occurring when a person "knowingly or intentionally has sexual intercourse with a member of the opposite sex when: (1) the other person is compelled by force or imminent threat of force." Ind. Code § 35-42-4-1(a) (2008).

The statutes presume that a person making such a report is acting in good faith, and immunize such good-faith conduct from civil or criminal liability. Ind. Code §§ 31-33-6-1, -3 (2008). But failure to comply with section 31-33-5-1 is a class B misdemeanor. Ind. Code § 31-33-22-1(a).[7]

---

[6] At several points in its brief, the State argues that it did not need prove the child's need for care, treatment, or rehabilitation through court intervention as an element of the offense. This reflects an incorrect analysis of the statute's evolution.

In 2012, the General Assembly amended sections 31-9-2-14 and 31-9-2-133 to provide that children identified as being victims of child abuse or neglect by application of the CHINS statutes found in sections 31-34-1-1 through 31-34-1-5 were victims of child abuse or neglect "regardless of whether the child needs care, treatment, rehabilitation, or the coercive intervention of a court." Ind. Code §§ 31-9-2-14, -133 (Supp. 2013); see Act of March 14, 2012, P.L. 48-2012, §§ 11, 22, 2012 Ind. Acts 850, 856. But this amendment is explicitly made effective as of July 1, 2012. See id. And this language did not exist in the statute at the time Smith was charged and tried.

Therefore, if the State were to pursue this charge against a defendant today, subsection (a)(2) of Indiana Code § 31-34-1-3 would not be an element of the offense. But at the time of Smith's trial, the State was still required to prove that subsection beyond a reasonable doubt.

[7] Smith's original charging information alleged that Smith, "a person who had reason [to] believe that a child may be the victim of child abuse or neglect," failed to comply with the reporting statutes, citing Indiana Code §§ 31-33-5-1, 31-33-5-4, and 31-33-22-1(a). (App. at 13.) In his motion to dismiss, Smith argued that criminal penalties were only assigned, by section 31-33-22-1(a), to violations of section 31-33-5-1, requiring a reason to believe that the child *is* a victim of child abuse or neglect—and not to violations of 31-33-5-4, requiring the (presumably lower) standard that a child *may be* a victim of child abuse or neglect.

The trial court's solution was to require the State to amend the charging information, striking "may be" and replacing it with "was." (App. at 79; Tr. at 1–2; Appellant's Br. at 17.) This approach is consistent with how appellate courts have applied these statutes. See, e.g., C.T. v. Gammon, 928 N.E.2d 847, 853 (Ind. Ct. App. 2010) (citing sections 31-33-5-1 and 31-33-5-4 as basis for requirement that "an

Therefore, in order for the State to successfully convict Smith of the class B misdemeanor offense of failure to report child abuse or neglect, it was required to prove beyond a reasonable doubt that Smith:

> (1) had reason to believe;
> (2) that G.G. was a victim of child abuse or neglect as
>     (a) a victim of rape
>     (b) who needed care, treatment, or rehabilitation that she was not receiving and that was unlikely to be provided or accepted without the coercive intervention of the court; and
> (3) Smith knowingly;
> (4) failed to immediately make a report to
>     (a) DCS or
>     (b) a local law enforcement agency.

---

individual who has reason to believe that a child is a victim of child abuse or neglect" must make report); Anonymous Hosp. v. A.K., 920 N.E.2d 704, 706 (Ind. Ct. App. 2010) ("Indiana law requires that an individual who has reason to believe that a child is a victim of child abuse or neglect shall immediately make a report to either the department of child services or the local law enforcement agency.").

While Smith initially claimed in his motion to dismiss that this rendered the charges against him unconstitutionally vague, he no longer makes this specific argument on appeal. But Smith is correct that we have previously taken constitutional issue with the use of the word "may" in criminal statutes, see State v. Downey, 476 N.E.2d 121, 123 (Ind. 1985) (use of phrase "may endanger" in neglect of dependent statute "ha[d] a broadness and vagueness which would prevent it from meeting constitutional muster"), reh'g denied, but there we simply construed the statute narrowly to save it from nullification, noting that doing so "[did] not establish a new or different policy basis and [was] consistent with legislative intent," id.

As in Downey, we think that "the use of the word 'may' . . . does not indicate a critical legislative choice or represent the resolution of important issues within the social problem involved," and "[t]he overall purpose of the statute as contemplated by the legislature would be well-served without the dimension in scope added by the term 'may.'" Id. We think instead the use of that word in section 31-33-5-4 most likely reflects a legislative intent to incorporate the scope of the "reason to believe" language found in section 31-33-5-1, and thus construe the former statute narrowly—as the trial court did—to require a report to DCS or law enforcement when a defendant has reason to believe that a child *is* a victim of child abuse or neglect. Cf. id.

10

**Discussion**

Smith's contentions on appeal relate to elements (1), (2)(b), and (4), as we list them above. He argues that the evidence at trial was insufficient to show beyond a reasonable doubt that he had reason to believe G.G. was a victim of child abuse, or that G.G. was a victim of child abuse as that term is defined by statute. And in a related sense, he argues that the phone call to the YOC satisfied his reporting obligation under the statutes and, alternatively, that his report to DCS four hours after G.G.'s allegation was "immediate." He also claims that the criminal provision through which he was subjected to punishment was unconstitutionally vague as it was applied to him. We address his constitutional claim first.

**I. The Reporting Requirement Is Not Unconstitutionally Vague**

When challenging the constitutionality of a statute, a party must clearly overcome a presumption of constitutionality. Fry v. State, 990 N.E.2d 429, 434 (Ind. 2013). We observe a high level of deference with respect to the General Assembly's decision-making, and any doubts are resolved in favor of constitutionality. Id. "We have no right to substitute our convictions as to the desirability or wisdom of legislation for those of our elected representatives." State v. Downey, 476 N.E.2d 121, 122 (Ind. 1985) (citing Sidle v. Majors, 264 Ind. 206, 209, 341 N.E.2d 763, 766 (1976)). We therefore review such challenges de novo. Lock v. State, 971 N.E.2d 71, 74 (Ind. 2012).

A criminal statute is unconstitutionally vague if the conduct sought to be prohibited is not clearly defined. Brown v. State, 868 N.E.2d 464, 467 (Ind. 2007). Such a due process failing may be reflected in one of two distinct statutory flaws: "(1) for failing to provide notice enabling ordinary people to understand the conduct that it prohibits, and (2) for the possibility that it authorizes or encourages arbitrary or discriminatory enforcement." Id. (citing City of Chicago v. Morales, 527 U.S. 41, 56 (1999)). We have therefore said that "there must be something in a criminal statute to indicate where the line is to be drawn between trivial and substantial things so

that erratic arrests and convictions for trial acts and omissions will not occur. It cannot be left to juries, judges, and prosecutors to draw such lines." Downey, 476 N.E.2d at 123. Likewise, the statute must define the offense with sufficient particularity that it "does not encourage arbitrary and discriminatory enforcement" and may not "vest[] virtually complete discretion in the hands of the police to determine whether the suspect has satisfied the statute." Kolender v. Lawson, 461 U.S. 352, 357–58 (1983).

Smith's challenge primarily falls under the first category of vagueness claims,[8] which means the challenged statute must "give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden so that 'no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed.'" Brown, 868 N.E.2d at 467 (quoting Healthscript, Inc. v. State, 770 N.E.2d 810, 816 (Ind. 2002)). It must "convey sufficiently definite warning as to the proscribed conduct when measured by common understanding." Rhinehardt v. State, 477 N.E.2d 89, 93 (Ind. 1985). We will affirm a statute's constitutionality against a vagueness challenge "if individuals of ordinary intelligence could comprehend it to the extent that it would fairly inform them of the generally proscribed conduct." Klein v. State, 698 N.E.2d 296, 299 (Ind. 1998). This challenge is assessed as the statute was applied to the particular defendant, "in light of the facts and circumstances of each individual case." Brown, 868 N.E.2d at 467.

Smith argues that the word "immediately" in Indiana Code § 31-33-5-4 is unconstitutionally vague as it was applied to his reporting duty under section 31-33-5-1. We disagree.

---

[8] He briefly claims that the statute also fails the second test because, he says, it lacks "ascertainable standards" and therefore "authorizes and encourages arbitrary and discriminatory enforcement." (Appellant's Br. at 39.) But we think our resolution of this issue addresses both points.

12

Smith made this same argument in his motion to dismiss, and the trial court also rejected it. Citing to an ordinary dictionary, Judge Cannon defined "immediately" as being "in an immediate manner; specifically, a) without intervening agency or cause; directly; b) without delay; at once; instantly." (App. at 78 (citing Webster's New World Dictionary of the American Language, College Edition (1968)).) He therefore found the word to be one commonly understood by ordinary individuals, that "rather straightforwardly and fairly informs a reasonably intelligent person when suspected child abuse must be reported." (App. at 78.) We agree with Judge Cannon's assessment.

Because Smith's claim hinges upon how ordinary people understand statutory language, we will also look to ordinary dictionaries for assistance. And those dictionaries tell us that "immediately" means without any intermediate intervention or appreciable delay.[9] In other words, when considered within the context of Indiana's reporting statutes, the use of the word "immediately" in Indiana Code § 31-33-5-4 conveys a required strong sense of urgency in action and primacy of purpose in fulfilling the duty to report. See Anonymous Hosp. v. A.K., 920 N.E.2d 704, 707 (Ind. Ct. App. 2010) (use of phrase "shall immediately" in reporting statute "makes clear that time is of the essence in such a situation"); cf. Barber v. State, 863 N.E.2d 1199, 1206 (Ind. Ct. App. 2007) (evidence sufficient to show defendant failed to stop immediately after accident when defendant slowed on interstate, observed accident, and turned off at next exit), trans. denied; Jenkins v. State, 596 N.E.2d 283, 283–84 (Ind. Ct. App. 1992) (affirming conviction for driving-related offenses after defendant caused accident and "did not stop immediately after the accident, but just 'kept going' for approximately one block").

---

[9] See Webster's II New College Dictionary 552 (1995) (defining immediately as "[w]ithout intermediary" and "'[w]ithout delay"); Webster's Third New International Dictionary 1129 (1976) (defining immediately as "without intermediary," "in direct connection or relation," "without interval of time," and "without delay").

13

We think this ordinary view of the term comports with the General Assembly's intent in enacting the reporting statutes—to encourage effective reporting of potential child abuse or neglect, to facilitate quick investigation of allegations by the proper authorities, and to protect the victims—and is not beyond the rational understanding of a reasonably intelligent person. Such a person would read this statute and clearly understand that his or her highest priority must be to report—or facilitate the report of—the known or suspected child abuse or neglect.[10]

So we reject Smith's implication that the statute must be vague without some explicit time limitation or boundary defining immediately. But alternatively, he argues that the statute could be narrowly construed to incorporate such a boundary—and specifically, he asks for the boundary of "immediately" to be up to twenty-four hours later. He analogizes his reporting requirement to the time frame found in Indiana Code § 31-33-8-1(b) (2008), which provided that when DCS received a report that a child may be a victim of child abuse, it was to initiate an investigation "immediately, but not later than twenty-four (24) hours after receipt of the report."

There are several problems with this approach. For one thing, it would hardly serve the purpose of the reporting statutes to permit—under every circumstance—school administrators to effectively sit on a report of potential (or even confirmed) child abuse for a full day before reporting it to the authorities. As perhaps the most dangerous resulting hypothetical, this would mean that a child could arrive to school with a black eye, that the child could tell a school official it came from his or her parent, and that the school could then send that child home at the end of the day—back to the abuser's "care"—and not make a report until the following morning. Additionally, this would mean that the DCS investigation might not begin for yet *another* day, meaning that a full forty-eight hours might pass from a school official noticing a child was being beaten at home to when the State could bring its full protective powers to bear.

---

[10] For the same reasons, we do not believe this word's inclusion in the statute renders it subject to arbitrary enforcement.

14

There is no rational way to permit such a universally broad view of the reporting statutes, given that they exist to quickly and effectively begin the process of investigating incidents of child abuse and removing those victims from their harmful surroundings. Put simply, the statutory scheme contemplates that individuals like teachers, school administrators, and hospital workers are often the first ones to become aware of serious problems in a child's life. The State therefore entrusts those people to be the first lines of defense with respect to our most vulnerable citizens, and it likewise imparts on them a sterner obligation of intervention.

For another thing, the General Assembly itself has rejected Smith's all-encompassing approach for the very statute he uses as authority. The current version of section 31-33-8-1 provides multiple outer limits for DCS, each reflecting different factual circumstances, but all under the broader heading of "immediately." For example, when the report alleges that a child may be a victim of child abuse, "the assessment shall be initiated immediately, but not later than twenty-four (24) hours after receipt of the report," Ind. Code § 31-33-8-1(e) (Supp. 2013), but when it is believed that "a child is in imminent danger of serious bodily harm," the assessment shall be initiated "immediately, but not later than one (1) hour, after receiving the report." Ind. Code § 31-33-8-1(d) (Supp. 2013). We will not construe a statute in a manner so clearly contrary to the General Assembly's view on the subject.

But finally, a criminal statute need not list with absolute specificity the prohibited conduct; "rather, it must inform the individual of the conduct generally proscribed." Brown, 868 N.E.2d at 467 (citing State v. Lombardo, 738 N.E.2d 653, 655 (Ind. 2000)); see also Vaillancourt v. State, 695 N.E.2d 606, 610 (Ind. Ct. App. 1998) ("The statute need only inform the individual of the generally proscribed conduct; a statute need not list, with itemized exactitude, each item of conduct prohibited." (quoting Mallory v. State, 563 N.E.2d 640, 644 (Ind. Ct. App. 1990), trans. denied), trans. denied. And we think that the statute here does so inform.

Under the facts of this case, no reasonable person of ordinary intelligence would have difficulty determining whether or not Smith acted with a sense of urgency or primacy of purpose when his report came after a four-hour delay that included doing intermediary tasks such as

conducting a personal interrogation of the alleged rapist, ordering the search of the involved students' lockers for evidence corroborating the alleged rapist's defense, *declining* to contact the police when asked (even though there were multiple officers in the building), and—most notably—conducting two hours' worth of unrelated and purely administrative job interviews. Nor do we think this case indicates that the statute was arbitrarily enforced by the police when the perpetrator of a sex crime was allowed to remain in the general student population and eventually returned home, and the scene of the assault was unsecured and left open for other students to use—all things resulting directly from the delay, which threatened to contaminate (or destroy) evidence of the crime, and all things which were imminently avoidable by the more prompt involvement of law enforcement. We therefore reject Smith's claim that Indiana Code § 31-33-5-4 is unconstitutionally vague as it was applied to him.

## II. The Evidence Was Sufficient to Sustain Smith's Conviction

In our review of a challenge to the sufficiency of the evidence underlying a conviction, we will neither reweigh evidence nor assess the credibility of witnesses. Bailey v. State, 979 N.E.2d 133, 135 (Ind. 2012). All probative evidence, even where it might be conflicting, and the reasonable inferences to be drawn from that evidence are viewed in the light most favorable to the judgment of conviction. Id. So long as an inference may be reasonably drawn from the evidence to the verdict, we will affirm unless no reasonable trier of fact could have found the elements of the crime proven beyond a reasonable doubt. Lock, 971 N.E.2d at 74; Gray v. State, 957 N.E.2d 171, 174 (Ind. 2011). "It is therefore not necessary that the evidence overcome every reasonable hypothesis of innocence." Id.

Smith, as we noted above, presents several challenges to the sufficiency of the evidence underlying his conviction. Specifically, he argues (1) that the evidence was insufficient to show that he had reason to believe G.G. was the victim of child abuse because there was no evidence that he had reason to believe (a) that a minor-on-minor rape was child abuse, and (b) that G.G. would only receive care, treatment, and rehabilitation through the coercive intervention of a

court, and; (2) that the evidence was insufficient to show that he failed to make an immediate report.

### A. Was the Evidence Sufficient to Show That Smith Had Reason to Believe That G.G. Was a Victim of Child Abuse?

As we laid out above, whether Smith had "reason to believe" that G.G. was a victim of child abuse meant the State was required to prove that he was presented with "evidence that, if presented to individuals of similar background and training, would cause the individuals to believe that a child was abused or neglected." Ind. Code § 31-9-2-101. And in his case, that required him to have reason to believe two things: that G.G. was a victim of rape, and that she was a child in need of services.

#### 1. Smith had reason to believe G.G. was a victim of rape.

Smith argues that of the five individuals of similar background and training who testified—Sloan, McCowan, Samuels, Jarvis, and McCord—none believed (at the time) that an allegation of a sixteen-year-old student raping another sixteen-year-old student constituted child abuse.[11] Smith concedes that Heller testified that he was aware of the need to immediately report the allegation, but argues that Heller was not an "individual of similar background and

---

[11] Sloan testified that he did not think the allegation constituted child abuse, and when he called the DCS hotline the operator asked if he was calling to report an instance of child abuse. Sloan said "[w]ell, I'm not sure, but, that is why I called is to let you tell me." (Joint Ex. 3 at 1.) McCowan testified that "I didn't see it as child abuse," (Tr. at 115), and Samuels testified that "I didn't think of it as child abuse. I thought of it more as a crime." (Tr. at 97.) McCord and Jarvis both knew the allegation was of a student sexually assaulting another student, but when asked if they thought that might be child abuse, they both testified "No." (Tr. at 36, 242.)

17

training" because Heller, Smith says, apparently had a much broader and lengthier level of experience in education and school administration.[12]

Smith also points to a number of exhibits admitted into evidence at his trial—administrative guidelines and manuals promulgated by the school district and, in one instance, edited and approved by DCS and the Delaware County Prosecutor's office—either not defining child abuse or defining child abuse as a sexual act between an adult and a child.[13] Thus, he says,

---

[12] Heller testified that when he was finally notified of the rape allegation, he told Smith to immediately call DCS because he knew Smith had a duty to report the allegation, and he knew this because "I had a superintendent friend in another state where I worked that didn't report child abuse that day, wanted to take another day, wanted to make an investigation himself. Sheriff come picked him up and took him to jail." (Tr. at 274.) "I knew that you needed to, uh, take the responsibility and get help." (Tr. at 275.)

At several points in his brief, Smith tries to highlight that neither the police nor the DCS hotline operator initially treated a minor-on-minor rape allegation as potential child abuse either. But if Heller's testimony cannot, for the sake of argument, be relevant to whether an "individual of similar background and training" to Smith had reason to believe this sort of allegation constituted child abuse, the views of a police officer and a DCS hotline operator are even less relevant.

[13] The district's Board of School Trustees' policy on child abuse and neglect provides that "[e]ach staff member employed by this Corporation shall be responsible for reporting immediately every case, whether ascertained or suspected, of abuse, abandonment, cruelty, or neglect resulting in physical or mental injury to a student by other than accidental means." (State's Ex. 1.) It directs staff to "immediately call the Delaware County Division of Family and Children or Muncie Policy [sic.] Department Juvenile Aide Division," and secure "prompt medical attention for any such injuries reported." (State's Ex. 1.) It also lists as authority several Indiana Code provisions: specifically, Indiana Code §§ 16-21-8-1 and 31-9-2-133, and chapters 31-33-5 and 33-34-1.

The district's Administrative Guideline on child abuse and neglect similarly stated that "[i]t is the responsibility of each staff member employed by the Muncie Community Schools to report immediately every case, whether ascertained or suspected, of abuse, abandonment, cruelty or neglect resulting in physical or mental injury to a student by other than accidental means." (State's Ex. 2.) It then set forth the procedure to be followed, which included directing the principal to "immediately call the Delaware County Division of Family and Children of [sic.] the Juvenile Aid Division of the Muncie Police Department." (State's Ex. 2.)

And a training pamphlet entitled "Child Abuse Prevention & Reporting: Roles and Responsibilities," was provided to staff at Muncie Central. (Tr. at 99.) Funded in part by the Delaware County DCS office and revised in 2007 by the Delaware County Prosecutor (Defendant's Ex. A at 3), the pamphlet defines child abuse as "any mistreatment or neglect of a child that results in non-accidental

to the extent the statutory definition of "reason to believe" encompasses "training," the evidence shows that he was trained to know that he had a duty to report child abuse, but not trained to believe G.G.'s allegation would have been child abuse.[14]

Clearly Smith, Sloan, Samuels, Jarvis, McCowan and McCord were all wrong in their belief that G.G.'s allegation of rape by another minor could not constitute child abuse—likewise, the training pamphlet available at the school was incorrect.[15]  As the statutory scheme we outlined above makes clear, rape is one of the predicate sex crimes that supports a CHINS determination and therefore, in turn, would constitute an instance of child abuse.  See Ind. Code §§ 31-9-2-133(a), 31-34-1-3(a), 35-42-4-1(a).  And the crime of rape has no limitation or qualification with respect to the ages of either the victim or the perpetrator.  See Ind. Code § 35-42-4-1.  A sixteen-year-old perpetrator commits the same crime as a forty-year-old perpetrator, so the minor victim of the sixteen-year-old would be a victim of child abuse just the same as the victim of the forty-year-old.  Smith does not contest his mistake of law.

The real issue in his claim is whether (or how) his error—shared as it was by the training pamphlet and his peers—impacts his culpability for the offense.  Does the required "reason to

---

harm or injury and which cannot *reasonably* be explained," (Defendant's Ex. A at 5 (emphasis in original).)  It provides that child abuse can include "physical abuse, emotional abuse, sexual abuse, and neglect," and defines "sexual abuse" as "[a]ny sexual act between an adult and child.  This includes fondling, penetration, intercourse, exploitation, pornography, exhibitionism, child prostitution, group sex, oral sex, or forced observation of sexual acts."  (Defendant's Ex. A at 5.)  It notes the statutory duty to report "suspected child abuse and neglect," and also directs school officials that "[y]our role and responsibility is not to investigate, but to report the abuse, set in motion the process of getting help for the child, and be supportive of the child."  (Defendant's Ex. A at 14.)

[14] This is a somewhat hollow assertion, given that the transcript of Smith's police interview—which was admitted at trial—shows unequivocally that he never read any of these policies anyway (or even knew that they existed), despite having access to them.

[15] Arguably, however, the district's administrative guidelines and policies directed the reporting of a sufficiently broad category of conduct that they might fairly encompass the proper definition of child abuse.

believe" refer to the defendant's awareness that the committed conduct satisfies the statutory definition of child abuse? Or does the phrase refer to the defendant's "reason to believe" that the conduct alleged actually occurred as a factual matter?

The State argues for the latter perspective. Because rape, as a matter of law, is a predicate offense to child abuse with no age qualification, the State interprets the statutory reporting scheme to mean that "Smith had a duty to immediately report that G.G. may be a rape victim when he knew information which would cause 'individuals of similar background and training . . . to believe that' G.G. had been raped." (Appellee's Br. at 11–12.)

The State views the statute's reference to training and background as gauging "the duty to report according to the training and background of the individual with knowledge of the facts," with the baseline standard being "a person of ordinary background and training." (Appellee's Br. at 13.) And the statute operates to excuse such an ordinary person from liability "merely on proof that he or she had observed signs or symptoms that could only have caused a trained expert to reasonably believe that abuse or neglect had occurred." (Appellee's Br. at 13.) "On the other hand, a trained emergency-room physician, or psychologist, might have such knowledge," and in that example assessment of what others with similar backgrounds and training might think would be relevant to such a defendant's criminal liability. (Appellee's Br. at 14.) Under this approach, the State argues, the element refers to Smith's knowledge of *factual* information, events, and circumstances, and how he—or other school administrators—would view those facts, and it is irrelevant whether he was operating under an incorrect *legal* assessment of the scope of the child abuse definition: ignorantia juris non excusat.

On one hand, Smith's claim has merit in that a person would only "knowingly" fail to report child abuse or neglect when they actually knew that the conduct constituted child abuse or neglect under the statutory scheme. And the State's position would then criminalize ignorance—

that is, if a defendant in good faith did not know that the conduct complained of constituted child abuse or neglect (perhaps a question of negligent behavior on the part of the defendant), they would be subjected to criminal liability.  In some cases, Smith's position might be proper.[16]

In light of the purpose of the reporting statutes, however, we think the State's view is correct.  As we mentioned above, the General Assembly has expressly charged particular individuals—like Smith—with a significant responsibility:  to serve as the first responders to incidents of child abuse and neglect, and to act swiftly to ensure the child is protected from further harm.  In furtherance of this responsibility, it has imposed a particular duty, with particular consequences for failure in that duty.  Smith does not challenge the existence or propriety of that duty—only whether he can be punished for not knowing its scope.

But if Smith's mistaken interpretation of the law were a defense to his criminal liability, it would remove all incentives from any such professionals to understand the scope of that statutory duty.  And it would, in effect, vitiate the duty entirely.  The statutes are aimed at "encourag[ing] effective reporting of suspected or known incidents of child abuse or neglect . . . provid[ing] effective child services to quickly investigate reports of child abuse or neglect . . . [and] provid[ing] protection for an abused or a neglected child from further abuse or neglect," Ind. Code § 31-33-1-1(1)–(3), but Smith would have us announce today that the obligations—

---

[16] For example, under certain (particularly federal) regulatory schemes with punitive consequences for non-compliance, there is some argument for requiring the strictest of "knowing" mens reas—that the defendant both affirmatively knew that the conduct was prohibited/required, and that the defendant acted intentionally regardless—as a way to avoid over-exposing the ordinary citizen to criminal liability under an increasingly large and obtuse body of criminal statutes.  See, e.g., U.S. v. Wilson, 159 F.3d 280, 293–96 (7th Cir. 1998) (Posner, C.J., dissenting).  In such cases, as Chief Judge Posner wrote, "the law is not a deterrent.  It is a trap."  Id. at 295.

But Smith's is not one of those cases.  Instead, this more readily falls into Chief Judge Posner's other category of offenses, where more stringent liability is permissible:  that category where "the defendant is warned to steer well clear of the core of the offense . . .  or to take the utmost care . . . *or to familiarize himself with the laws relating to his business*."  Id. at 296 (emphasis added).

and penalties—imposed to further those purposes can be avoided by accidental, or even willful, avoidance of learning what falls under the statutory scheme.[17]

The primary goal of statutory interpretation is to give effect to the General Assembly's intent, Nicoson v. State, 938 N.E.2d 660, 663 (Ind. 2010), not to undermine it. And to say this approach would chill reporting of child abuse or neglect in Indiana would grossly understate its impact. It would tacitly encourage administrators and other professionals to simply not read the statutes in full because, to sum up Smith's defense: if you just don't learn what child abuse is, you'll never get in trouble for not reporting it. It would reward systemic ignorance in entire school districts and corporations, to the obvious detriment of the very children the statutes are supposed to be protecting. And it would turn the high school principal's decision-making process, when faced with a traumatized child, into a Bar exam question.

And in fact, we think the statutory scheme contemplates just the opposite of Smith's argument: it is designed, if anything, to err on the side of *over*reporting suspected child abuse or neglect. To that end, the statutes presume a report is made in good faith and immunize from civil or criminal liability the person who makes such a report. Ind. Code §§ 31-33-6-1, -3. The statutes do not, however, presume that a *failure* to file a report was done in good faith, or

---

[17] And why limit Smith's approach to these reporting statutes? Our general criminal culpability statutes define "knowingly" in a way similar to Smith's contention that his "reason to believe" is a nearly absolute certainty of knowledge. See Ind. Code § 35-41-2-2(b) (2008) (defendant "engages in conduct 'knowingly' if, when he engages in the conduct, he is *aware of a high probability* that he is doing so" (emphasis added)). And more than one criminal provision incorporates statutory definitions that might be subject to misinterpretation.

So would Smith have us excuse from criminal culpability the serious violent felon who possesses a shotgun, truthfully not knowing that it meets the definition of a firearm? See Ind. Code §§ 35-47-1-5, -4-5 (2008). Do we forgive the individual who, after his driver's license is suspended, is caught driving a bus but claims he did not know a bus was a motor vehicle? See Ind. Code §§ 9-13-2-105, -30-10-16 (2010). Surely the answer to these questions must be "no," even if those criminal statutes included consideration of legal opinions from other serious violent felons or suspended drivers.

22

immunize from liability those persons who, even in good faith, believe that a report is not necessary.

In other words, the General Assembly has protected those who report and are mistaken, not those who are mistaken (or intentionally ignorant) and do not report. Our decision today may increase the number of individuals who fall into the former category, but if we did as Smith suggests we would certainly risk increasing the number of individuals in the latter. One outcome comports with the General Assembly's stated intent; the other most certainly does not.

Having resolved this, we reach the question of whether the evidence was sufficient to show that Smith had reason to believe G.G. was the victim of child abuse by virtue of her rape allegation.[18] And in this regard the record shows that a fellow student brought G.G. to McCord's office, where G.G. told Smith—and every subsequent administrator brought into the room—that she had been raped. G.G. was "humped over, drawn inward, hands, she kept her hands, her face in her hands. Not really making eye contact with [McCord]. Just talking," and she was crying. (Tr. at 13.) She also clearly articulated her attacker's identity, the circumstances, the time she was attacked, and the location of the attack.

---

[18] Smith argues to the effect that the required "reason to believe that G.G. *was*" a victim of child abuse—as opposed to the initially charged "reason to believe that G.G. *may be*" a victim of child abuse—requires an absolute level of certainty on his part. (Appellant's Br. at 34–35.) But despite our misgivings with the use of the potentially overbroad phrase "may be," we reject his proposition that he had to know, effectively beyond a reasonable doubt, that G.G. was a victim of child abuse before he was required to report.

Smith's level of certainty need not have been that high. Cf. Duran v. State, 930 N.E.2d 10, 15–16 (Ind. 2010) (in context of warrantless entry into home, "it is 'generally accepted' that reason to believe 'involves something less than' probable cause" (quoting 3 Wayne R. LaFave, Search and Seizure, § 6.1(a), at 265 (4th ed. 2004)); Lebo v. State, 977 N.E.2d 1031, 1038–39 (Ind. Ct. App. 2012) ("The failure to report statute does not require that an individual have actual knowledge of child abuse or neglect. Rather, a duty to report is imposed on an individual who merely has 'reason to believe' a child is the victim of such a crime."). To the extent the ultimate outcome of the report requires proof beyond a reasonable doubt, it is the responsibility of DCS, law enforcement, and the prosecutor to gather that proof.

It is apparent that Smith had some doubts as to G.G.'s veracity, but it is equally apparent that Smith took the allegation seriously enough to summon the school nurse and direct Samuels to contact the YOC, call the senior administrators in the district to ask for guidance, begin his own personal interrogation of the perpetrator, and direct the search of student lockers. And when reviewing a sufficiency of the evidence claim, we view "[t]he evidence—even if conflicting—and all reasonable inferences drawn from it . . . in a light most favorable to the conviction." Bailey, 979 N.E.2d at 135. And doing so here leads us to conclude that there was sufficient and substantial evidence of probative value to support the fact-finder's determination that Smith had reason to believe that the factual circumstances alleged by G.G. actually occurred—that she was the victim of a rape.

### 2. Smith had reason to believe G.G. was a child in need of services.

As we explained, the definition of "victim of child abuse or neglect" at the time of Smith's trial required more than just a reason to believe the predicate offense occurred. The State must also have shown that Smith had reason to believe "the child need[ed] care, treatment, or rehabilitation that: (A) the child [was] not receiving; and (B) [was] unlikely to be provided or accepted without the coercive intervention of the court." Ind. Code § 31-34-1-3(a). This is, as Smith says, because "the General Assembly ha[d] simply adopted the CHINS categories as the definition of child abuse or neglect." (Appellant's Br. at 31.)

At the outset, though we acknowledge that the General Assembly adopted the CHINS statutes in crafting its definition of child abuse, we doubt that its intent in doing so was to require school and hospital officials to make accurate assessments of whether a particular child needed particular care, treatment, or rehabilitation that he or she was not receiving and that could only be provided through court intervention. Under the reporting statutes, this assessment is to be completed by DCS, through its local offices, following the receipt of a report of suspected child abuse or neglect from medical or school personnel. See Ind. Code § 31-33-8-1 (2008). Similarly, the filing of a CHINS petition—seeking treatment, care, or rehabilitation through coercive intervention of a court—is a DCS (or prosecutor) responsibility, see Ind. Code § 31-34-

24

9-1 (2008), and the scope of any resulting care, treatment, or rehabilitation is a determination the statutes entrust to the presiding juvenile court judge, see Ind. Code § 31-34-19-10 (2008).

This aspect of the statutory CHINS definition involves a determination made after deliberate, in-depth, and specialized inquiry and assessment. We cannot imagine it being something that the General Assembly expected a school principal to perform "immediately." We think, and the recent statutory amendments to sections 31-9-2-14 and 31-9-2-133 of the Indiana Code reflect, that the General Assembly intended instead for individuals like Smith to identify— and report—the factual circumstances indicating that the child abuse or neglect was occurring. And by this we mean the "symptoms" of child abuse or neglect, as it were: the marks of physical trauma, signs of malnourishment, or changes in personality or interaction that might be the first visual indications of the underlying "disease" of an abusive environment or neglectful parents.

Nevertheless, this was an aspect of the statutory definition of "child abuse or neglect" at the time Smith was charged and tried, and it is thus a part of his conviction for which there must have been sufficient evidence introduced at his trial. But under the particular facts of this case, we still think such evidence was present.

Smith concedes that G.G. had already been adjudicated as a child in need of services by the Madison Superior Court—a circumstance known to Smith and the other administrators at the time G.G. informed them of the rape. He argues, however, that the necessity for care, treatment, or rehabilitation pursuant to his present conviction must arise "as a result of this incident." (Appellant's Br. at 29.) And he says that to the extent G.G. *did* receive care, treatment, and rehabilitation as a result of this incident, she received those things without the necessity of court intervention.

But the need for care, treatment, or rehabilitation does not have to arise "as a result of this incident," as Smith claims. The CHINS statute provides that "the child needs care, treatment, or rehabilitation that . . . the child is not receiving; and . . . is unlikely to be provided or accepted without the coercive intervention of the court." Ind. Code § 31-34-1-3(a)(2). There is no

25

requirement that this be a new and distinct determination for each subsequent incident, either in the reporting statutes or the CHINS statutes generally.

In fact, the CHINS statutes presume that once a dispositional decree is made regarding a child's CHINS status, such a decree remains in force with periodic reviews and progress reports subjecting it to modification, until the goals of the decree are met and the child is discharged by the court—unless a determination is made that the goals will never be met and a permanency plan is established. See generally Ind. Code chapters 31-34-20, -21, and -23. Additionally, the CHINS structure is designed to operate "on a county-by-county basis," with the individual DCS county offices or county prosecutors filing the petitions and representing the interests of the State, with a county caseworker doing the predispositional investigation and assessment, a judge from the county adjudicating the petition, and the county itself funding the court-ordered treatment. In re E.I., 653 N.E.2d 503, 509 (Ind. Ct. App. 1995). So absent a rarer circumstance in which a child moves to a different county, we do not think it likely that those actors would file a new CHINS petition if a dispositional decree were already in place—they would simply seek to modify that current decree.

Put another way, both the statutory scheme and the manner in which it operates show that once coercive intervention is sought and provided, that coercive intervention would remain the method through which the child's care, treatment, and rehabilitation were provided. Thus, any new or additional care, treatment, or rehabilitation needed—even if arising from a new or additional incident—would likewise only come as a result of the prior coercive intervention of the court.

We acknowledge that Smith's case may be unique, in that the General Assembly's amendments to the reporting statutes mean the State no longer must prove that a defendant charged with failure to report had reason to believe the child needed care, treatment, or rehabilitation that could only be provided through the coercive intervention of a court. And the inverse impact of this amendment is that going forward, the duty to report for school and medical officials is significantly stricter. They must immediately report suspected child abuse or neglect

to DCS or law enforcement when they have reason to believe it has occurred—regardless of whether the child is being cared for by his or her parents, guardians, or the State, and regardless of how the official assesses the quality of that care.

To be sure, nothing in the statutes prohibited Smith from making a report to the police or DCS even absent his knowledge of G.G.'s status as a CHINS, as a matter of good practice, decency, or common sense. But in this case we are dealing only with when those statutes specifically obligated him to report such that it was a crime for him to do otherwise. And here, but for G.G's pre-existing status as a CHINS—and Smith's knowledge of that status—Smith's conviction might not stand.

Consider, for example, if G.G. was *not* a CHINS and lived instead with her mother, and Smith knew that G.G.'s mother would provide the care, treatment, and rehabilitation that she needed. Under those circumstances, a rape by another student occurring within the school's halls would probably not give Smith any reason to believe that coercive intervention of the court was necessary to get G.G. help—and thus he would have had no obligation to immediately make a report to DCS or law enforcement. Similarly, if G.G.'s status as a CHINS was still pending disposition, or was a matter kept concealed from the school's officials, Smith might still rightly have assumed that her mother would provide the necessary care, treatment, and rehabilitation, and would also probably not give Smith any reason to believe that G.G. required the coercive intervention of a court.

But here the evidence admitted at his trial shows that Smith knew that G.G. was already subject to a CHINS decree making her a ward of DCS and ordering her to remain in the care of the YOC in order to "ensure that [G.G.] has a safe and stable environment where her well-being

27

is not compromised."[19]  (Def. Ex. D.)  And in the event she needed *any* care, treatment, or rehabilitation—for this incident or *any* incident—the record shows that Smith knew it must be provided by the YOC, which would only occur a result of the prior—and continuing—coercive intervention of the Madison Superior Court.  This is apparent from, if nothing else, the fact that Smith directed Samuels to call the YOC and not G.G.'s mother when he heard the allegation: because he knew the YOC, not G.G.'s mother, was the entity that would come to the school, pick up G.G., take her to the hospital, and get her treatment.

Under the particular evidence presented at Smith's trial, and viewing "all reasonable inferences drawn from it," Bailey, 979 N.E.2d at 135, we conclude that a reasonable fact-finder could have found beyond a reasonable doubt that Smith had reason to believe G.G. needed care, treatment, or rehabilitation that could only be provided through the coercive intervention of a court.

### B. Was the Evidence Sufficient to Show That Smith Failed to Report Immediately?

Smith also challenges his conviction with respect to whether he failed to make an immediate report to DCS or local law enforcement.  He claims first that his phone call to the YOC satisfied his statutory obligation to report to DCS or local law enforcement and second, that

---

[19] In addition to G.G.'s dispositional decree being admitted into evidence at trial, Samuels testified that Smith directed her to call the YOC (as opposed to the police), and that she knew the YOC was G.G.'s "custodial parent." (Tr. at 62.)  Samuels "knew [G.G.] had been placed there by [the] Division of Child Services or by a judge and that they needed to know." (Tr. at 62–63.)  It is a reasonable inference to be drawn from this—and Smith's several phone calls to the YOC himself—that Smith also knew G.G.'s status as a CHINS.

even if the call to the YOC were insufficient, his eventual report four hours later was "immediate."[20]  We disagree on both claims.

### 1.  *Smith's phone call to the YOC was not a report pursuant to the statutes.*

The reporting statutes required Smith to make his immediate report to DCS or a law enforcement agency.  Ind. Code § 31-33-5-4.  Smith argues the evidence was insufficient to show that he failed in this obligation because the YOC, which he directed Samuels to contact immediately after hearing G.G.'s allegation, is an agent of DCS (both at the state and county levels), and pursuant to that agency relationship "notification to the YOC is the legal equivalent of notification to DCS.  Therefore, DCS was timely given notice of the reported assault, and no liability for failure to report exists."  (Appellant's Br. at 25, 27.)   There are a number of reasons why this is incorrect.

First, the statutes explicitly designate two agencies to which the report must be made: DCS or law enforcement.  And unlike the YOC, both are neutral and detached entities tasked with investigating and assessing allegations of child abuse and neglect.  If we permitted a private entity—into whose care a child is placed in lieu of parents—to also serve as an agent for DCS for purposes of the reporting statutes, we would leave vulnerable to abuse or neglect those children placed with those entities because school officials could simply report the abuse to the abuser and be done with the matter.  For example, if G.G. arrived at school with fresh bruises, and a teacher reported those bruises to Smith believing they were signs of child abuse occurring at the YOC, under Smith's rationale he could simply call the YOC and everything would be okay.  Moreover, assuming such a third-party agency would then contact DCS to initiate an

---

[20] To an extent, these are claims that Smith presented evidence tending to show his compliance with the statute; his innocence.  They are therefore at least somewhat improper under our standard of review, as they ask this Court to reweigh the evidence presented at trial.

investigation and assessment, Smith's agency theory adds yet another layer of bureaucracy to what is supposed to be an "immediate" report. Clearly this would support neither the statutes' purposes of encouraging effective reporting, quick investigation, and protecting children, nor the General Assembly's intent in enacting the statutes.

And second, though the Indiana Code permits DCS to designate a public or private agency to investigate reports of child abuse or neglect in cases involving children in the care of a public or private institution, Ind. Code § 31-33-9-1(a) (2008), Smith points us to no evidence in the record where that designation was made "[t]hrough a written protocol or agreement," as that statute requires. Smith claims that the YOC's master contract authorizes the YOC to "provide, or arrange for routine or emergency medical, surgical, hospital, or psychiatric hospital care for [G.G.], as needed" while residing at the YOC, (Appellant's Br. at 25–26), but this is a far cry from DCS delegating its investigative authority or empowering the YOC to serve as the recipient of a report of suspected child abuse or neglect.[21]

But in any event, the essence of Smith's claim is that the placement agreement between DCS and the YOC regarding G.G., read alongside the YOC's master contract with DCS, is a "unified contract, specifically the reporting duties it imposes, [that] renders the YOC an agent of the DCS." (Appellant's Br. at 25.) In reality, the contract does the precise opposite of what Smith claims.

Section 21 of the YOC's master contract provides:

> Both parties hereto, in the performance of this Contract, shall act in
> an individual capacity *and not as agents*, employees, partners, joint

---

[21] For that matter, the portion of the placement contract that Smith cites to is not in the trial exhibit as it is presented to us in the appellate record. The copy of the master contract provided skips from page 2 to page 8.

> venturers or associates of one another.  The employees or agents of
> one party *shall not be* deemed or construed to be the employees or
> agents of the other party for any purposes whatsoever.

(Def. Ex. C at 22 (emphasis added).)

We can think of no clearer repudiation—by both the YOC and DCS—of Smith's theory. Thus, even were we to accept his idea as a policy matter (which we do not), we would have to reject it as a matter of agency and contract law.  His phone call to the YOC could not, and did not, satisfy his responsibility under the reporting statute, and therefore his argument that "the undisputed evidence was that [Smith] caused a report to be made to the agent of DCS within 25 minutes, and DCS received actual notice from its agent within approximately 40 minutes, both of which time frames should be deemed sufficiently immediate as a matter of law," must fail. (Appellant's Br. at 28.)

### 2. Smith's eventual report was not immediate.

Finally we reach the ultimate question in this case:  was Smith's eventual report to DCS—his phone call to the DCS hotline made about four hours after he became aware of G.G.'s rape allegation—sufficiently immediate as to relieve him of criminal liability?  He argues that the statutes governing DCS's investigation requirements provide a twenty-four-hour deadline, that the YOC's master contract also provided a twenty-four-hour deadline, and that DCS trained educators that they had twenty-four hours to report abuse.  He also asserts that "[s]chool policy was to collect information before reporting matters to the authorities . . . and certainly the statute permits a citizen some time to assess and reflect before he reports, without penalty of being labeled a criminal and having his job and license in peril."  (Appellant's Br. at 34.)

Smith's argument that a report made within twenty-four hours should be considered immediate overlaps with his alternative relief sought in his claim that the reporting statutes are unconstitutionally vague.  We rejected it in that context, and for the same reasons do so here.

31

We also reject his claim that the school policy permitted him to conduct the level of investigation that he now says justifies his delay in reporting, even assuming his school's policy could trump the statutory requirement and common understanding of the word "immediately" as we provided above. Though McCowan testified that when a report was made, "they are going to ask specific questions about the student's age, the address, where it occurred," and therefore "you have to collect some information," (Tr. at 126), this is not evidence that the school's policy of collecting information included interrogating the perpetrator, conducting a search of the victim's and perpetrator's lockers, and seizing notes found in those lockers. McCowan was referring to making sure that the administrator had certain biographical information available to provide to DCS or the police before reporting the child abuse or neglect (all of which Smith already had); but what Smith did was conduct a criminal investigation. And conducting an investigation is expressly forbidden in the training materials that Smith failed to read.

And we also reject his belief that the reporting statutes permit a citizen to delay reporting in order to "assess and reflect" before facing criminal liability and professional censure. In fact, the statutes do the opposite—they *require* immediate reporting of suspected child abuse or neglect, and in furtherance of that aim immunize from criminal and civil liability those who immediately report conduct that turns out after later assessment and reflection *by DCS or law enforcement* to have been innocent.

Smith cites to <u>Phillips v. Behnke</u>, 531 N.W.2d 619 (Wis. Ct. App. 1995), as support for his position that he was permitted to assess and reflect before making his report. We find that case inapposite for several reasons.

In <u>Behnke</u>, the young daughter of two parents—one of whom was a school principal— filed a report with law enforcement that she was being touched inappropriately by a teacher at school. The parents conducted their own investigation and then reported the allegation to the school district's superintendent. The superintendent interviewed several students to substantiate the claim, then notified the county office of Wisconsin's Social Services Department. The abusive teacher's license was later revoked, and that teacher then sued the parents, the

superintendent, and others, claiming—amongst other things—that the parents and superintendent failed to immediately report the abuse as required by Wisconsin's reporting statutes. The parents and superintendent sought summary judgment based on immunity provisions contained in those same statutes. The trial court granted their motions and the Wisconsin Court of Appeals affirmed.

The statutes in effect at the time were broadly similar to Indiana's, requiring school officials "having reasonable cause to suspect" that a child was being abused or threatened with abuse to "immediately" report the facts and circumstances giving them that belief. Id. at 621–22 (quoting Wis. Stat. § 48.981(2), (3)). They also provided immunity for persons "participating in good faith in the making of a report." Id. at 622 (quoting Wis. Stat. § 48.981(4)). Under the statutes, both the parents and the administrators were therefore required to report the suspected abuse once they had "reasonable cause to suspect" that it had occurred.

In affirming the trial court's grant of summary judgment, the Wisconsin Court of Appeals rejected "any suggestion that reasonable attempts at verification deprive a reporter of immunity under the statute." Id. at 622–23. The statutory scheme was "void of any consequence for a delay in the reporting of information," and "expending a reasonable amount of time to verify a child's allegation of sexual misconduct is consistent with the statute's requirement that such information be reported immediately." Id. at 623. Because of the harm that an unfounded allegation of inappropriate sexual conduct has on the accused's reputation and career, "investigating the reasonableness of one's belief that a teacher has engaged in sexual misconduct prior to making a report is proper and does not deprive the individual of immunity." Id.

One particular difference between this case and the one before us is the absence of "any consequence for a delay in the reporting of information." Clearly Indiana's statutes attach a

consequence for delay, otherwise Smith's cause would not be before this Court.[22]  And from a procedural standpoint, the State of Wisconsin was not pursuing the action against the parents and superintendent as a criminal matter for failure to report, as we have here with Smith.  Instead it was the perpetrator of the sexual misconduct who filed a civil complaint and sought to undermine the defendants' claims of immunity by arguing that their reports were not made immediately.

And while we acknowledge—and share—the Behnke court's respect for the gravity of a charge of sexual misconduct, our statutory structure has protections in place to ameliorate the implications of a false report and deter intentional false reporting.  The Indiana Code criminalizes the intentional communication of a known false report of child abuse or neglect, and also provides a private right of action for the victim of such an act.  See Ind. Code § 31-33-22-3 (Supp. 2013).  Additionally, when a report is investigated and found to be unsubstantiated, any interested person may petition DCS to expunge information related to that assessment.  Ind. Code § 31-33-27-3(b) (Supp. 2013).  And in any event, DCS is required to expunge child abuse or neglect information no later than the twenty-fourth birthday of the youngest child named in the assessment, if the report is unsubstantiated.  Ind. Code § 31-33-27-3(a).

To the extent there remains risk to an alleged abuser's reputation arising from an unsubstantiated report, we think the General Assembly has made that risk secondary to the statutory scheme's overall aim of promoting more reports, not fewer, in an effort to provide better protection for children in this state.  It is not our place to say whether this is a correct balancing or not.  "[W]e will not substitute our judgment or opinion on such matters for that of the legislature."  Dague v. Piper Aircraft Corp., 418 N.E.2d 207, 212 (Ind. 1981).

---

[22] Although we note that when Behnke was decided, Wisconsin's reporting statutes—as they still do now—contain a penalty provision for "[w]hoever intentionally violates this section by failure to report as required," subjecting that person to a fine of up to one thousand dollars and/or six months in prison.  Wis. Stat. § 48.981(6).

Also, as we discuss above, it is not the school administrator's responsibility to investigate. That responsibility is firmly placed with DCS and law enforcement. The school administrator, under our statutes, is the "trip-wire" that triggers the investigation and assessment, not the one who undertakes the investigation and assessment. And on that point, we have already determined that Smith had reason to believe G.G. was the victim of child abuse without his needing to conduct any further inquiry.

Finally, even if we were to accept the Behnke rationale that "immediately" includes some "reasonable amount of time" to confirm the suspected child abuse or neglect, that case does not provide any frame of reference off of which we may proceed. It is not clear how long the superintendent investigated the claim, how long it took the parents to conduct their investigation, or the scope and extent of the investigation. We do not know if the delay was greater than, less than, or the same as the four-hour period Smith took before contacting DCS. It therefore stands as an unhelpful guidepost to our review.

As Smith himself says, "it is left to the trier of fact to determine whether under the circumstances of the case the report was made fast enough in keeping with the purpose of the statute." (Appellant's Br. at 33.) And under the definition of "immediately" that we believe most people of ordinary intelligence would employ in such a case—and the one employed by the finder of fact here—the length of the delay is not the only thing that matters. What also matters is the urgency with which the person files the report, the primacy of the action, and the absence of an unrelated and intervening cause for delay.

Judge Vaidik, in her dissent below, proposed several factors to help make this assessment:

> (1) the identity of the person to whom the victim reports abuse; (2) the impact of any delay in reporting the abuse to the authorities might have on evidence of the alleged crime; (3) the length of time between the victim's report and the report to the authorities; and (4) the circumstances of any delay in reporting.

35

Smith, 982 N.E.2d at 365.  We think this proposal reflects our definition of "immediately" quite well, but because fact-finders can properly apply this definition using their common understanding, we do not need to adopt a specific factor-based test.

But as Judge Vaidik's proposed test implies, this is necessarily a case-specific and fact-specific question.  For example, if a school administrator on a backcountry camping trip with a school group discovered bruises on one of his students that gave him reason to believe the child was being abused, we likely would not uphold a conviction for failure to immediately report the child abuse even if it took days for the administrator to hike back to civilization and make the report.  But we might think differently if, say, the same school administrator completed the camping trip, allowed the abused student to return home, and waited until the next available business day before he called DCS or law enforcement.  Similarly, if a school principal received notice at the beginning of the school day that a student was a victim of child abuse, and severe storms then required his staff and students to take shelter for four hours, we would probably find a report made after the emergency conditions had passed to be immediate.  But we would not look so favorably on a four-hour delay during which, hypothetically, the principal spent his time conducting teacher training or something else of a lesser administrative priority than reporting child abuse.

And here it is the lack of primacy of action and the presence of an unrelated intervening cause for delay that seals Smith's fate.  Even if we were to accept that he did not have "reason to believe G.G. had been raped" without first interrogating S.M. and searching G.G.'s and S.M.'s lockers, which we do not, Smith then ignored repeated opportunities to contact the police—several of whom were in his building—or call DCS, and proceeded to instead conduct several hours of job interviews for open administrator positions.  At that point Smith was neither reporting nor investigating—he was ignoring the issue.  And it was only after these meetings, and after Smith spoke to Heller on the phone, that Smith called DCS.  And during this period,

S.M. was allowed to return to the student population and then eventually went home, and the restroom in which G.G. said the attack occurred was left unsecured and open to contamination.[23]

In sum, it appears from the record as though when time was of the essence, Smith dawdled, delayed, and did seemingly everything he could to *not* contact DCS or the police. It is therefore a reasonable inference to draw, from this evidence, that Smith knowingly failed to "immediately" report the child abuse as he was obligated to do by statute.

**Conclusion**

It is apparent that Christopher Smith failed in his duty to help protect one of his trusted charges. Whether this failure was out of ignorance, a desire to protect the reputation of the perpetrator, or perhaps a wish to keep his school from receiving negative publicity on his watch is not clear. But none of those possible reasons are excuses under the Indiana Code's statutory provisions compelling him to report instances of child abuse or neglect or face criminal liability. We therefore affirm Smith's conviction and sentence.

Massa and Rush, JJ., concur.
Rucker, J., dissents with separate opinion in which Dickson, C.J., concurs.

---

[23] By way of comparison, the staff at Ball Memorial Hospital called the police within an hour of G.G.'s arrival, with that delay apparently attributable to the lack of an immediately available sexual assault nurse.

**Rucker, J., dissenting.**

What apparently began as an investigation for obstruction of justice morphed at some point into a charge and eventual conviction for failure to report child abuse. Reasoning that the evidence was sufficient to sustain the conviction the majority affirms the conviction. For reasons expressed below I cannot join the majority on this point and thus respectfully dissent. In all other respects I concur in result.

The charged offense requires reference to no fewer than five separate statutory provisions contained in two different titles and four different articles of the Indiana Code.[1] To begin, Smith was prosecuted pursuant to Indiana Code section 31-33-22-1(a) which provides: "A person who knowingly fails to make a report required by IC 31-33-5-1 [Chapter 5] commits a Class B misdemeanor." In turn Chapter 5 (entitled "Duty to Report Child Abuse or Neglect") includes Section 1 entitled "Duty to make report" which provides in relevant part: "[A]n individual who has reason to believe that a child is a victim of child abuse or neglect shall make a report as required by this article." I.C. § 31-33-5-1. This section does not include a definition of "child abuse or neglect" or tell us the meaning of "reason to believe," but in a different article (Article 9, entitled "Definitions") contained within Title 31 we pick up the trail: "'Child abuse or neglect', for purposes of IC 31-32-11-1, IC 31-33, IC 31-34-7-4, and IC 31-39-8-4, refers to a child who is alleged to be a child in need of services as described in IC 31-34-1-1 through IC 31-34-1-5. . . ." I.C. § 31-9-2-14. Next, "'[r]eason to believe', for purposes of IC 31-33, means evidence that, if presented to individuals of similar background and training, would cause the individuals to believe that a child was abused or neglected." I.C. § 31-9-2-101. For further elucidation on the definition of "child abuse or neglect" we are referred to Article 34 in the same title, entitled "Juvenile Law: Children in Need of Services." Within that article we find Chapter

---

[1] The Indiana Code is divided into 36 "titles." "Each title is further subdivided, first, into 'articles,' then 'chapters,' and then 'sections.'" Healthscript, Inc. v. State, 770 N.E.2d 810, 816 n.7 (Ind. 2002). The citation "Ind. Code § 31-33-22-1" refers to Section 1 ("Failure to make report") of Chapter 22 ("Offenses; Access to Unsubstantiated False Reports") of Article 33 ("Juvenile Law: Reporting and Investigation of Child Abuse and Neglect") of Title 31 ("Family Law and Juvenile Law").

1 ("Circumstances Under Which a Child Is a Child in Need of Services") and therein find Section 3 ("Victim of sex offense; living in household with victim of sex offense").[2]

And finally, when we examine Title 35 ("Criminal Law and Procedure"), Article 42 ("Offenses Against the Person") we find in Chapter 4 ("Sex Crimes"), Section 1 ("Rape") the following relevant language: "[A] person who knowingly or intentionally has sexual intercourse with a member of the opposite sex when . . . the other person is compelled by force or imminent threat of force . . . commits rape, a Class B felony." I.C. § 35-42-4-1.

After painstakingly parsing the multiple statutes involved, the majority concludes that the "reason to believe" language in section 31-33-5-1 refers only to the existence of the underlying facts and not to whether those facts constitute child abuse. The latter question, the majority

---

[2] The statute provides in relevant part:
>    (a) A child is a child in need of services if, before the child becomes eighteen (18) years of age:
>    (1) the child is the victim of a sex offense under:
>        (A) IC 35-42-4-1;
>        (B) IC 35-42-4-2;
>        (C) IC 35-42-4-3;
>        (D) IC 35-42-4-4;
>        (E) IC 35-42-4-7;
>        (F) IC 35-42-4-9;
>        (G) IC 35-45-4-1;
>        (H) IC 35-45-4-2;
>        (I) IC 35-46-1-3; or
>        (J) the law of another jurisdiction, including a military court, that is substantially equivalent to any of the offenses listed in clauses (A) through (I); and
>    (2) the child needs care, treatment, or rehabilitation that:
>        (A) the child is not receiving; and
>        (B) is unlikely to be provided or accepted without the coercive intervention of the court.
>
> I.C. § 31-34-1-3.

contends, is clearly answered by dissecting the numerous statutory provisions cross-referenced from section 31-33-5-1. Thus, the majority confines the question to whether "Smith had reason to believe G.G. was a victim of rape." Slip op. at 17. I disagree. In my view the real question is whether "the evidence was sufficient to show that Smith had reason to believe G.G. was the victim of child abuse by virtue of her rape allegation." Slip op. at 23. And though the majority views this as a typical sufficiency question—viewing the evidence and all reasonable inferences drawn from it in the light most favorable to the conviction—I believe it involves a matter of statutory interpretation, which we review de novo. See N.L. v. State, 989 N.E.2d 773, 777 (Ind. 2013).

The statutes at issue are ambiguous, confusing, complex, and interwoven. Under the rule of lenity we construe criminal statutes strictly against the state and resolve ambiguities in favor of the accused. Shuai v. State, 966 N.E.2d 619, 628 (Ind. Ct. App. 2012), trans. denied; cf. Healthscript, Inc., 770 N.E.2d at 815 (employing the rule of lenity and constitutional doctrine in concluding a link in statutory language was "too attenuated" to support prosecution). Here, the evidence at trial demonstrated: (1) all witnesses with "similar background and training" to that of Smith did not think the rape of a minor student by another minor student constituted "child abuse"; (2) the DCS itself did not interpret the report of this event to be child abuse; and (3) a "Child Abuse Prevention & Reporting" pamphlet funded by the local DCS and revised with input of the very prosecutor's office prosecuting this case instructs that child abuse can include "[s]exual abuse" which it defines as "[a]ny sexual act between an adult and child." Defendant's Ex. A at 5. This evidence compels me to conclude that as applied to this case the critical inquiry is whether Smith knew or should have known that rape of a minor student by another minor student constituted "child abuse." In my view the evidence is clear. He did not.

Further I depart from the majority's view that its interpretation of the statute is necessary to effectuate the statutory purposes of encouraging child abuse reporting and providing fast and effective protection and rehabilitation for abused children. Specifically, I disagree with the

3

suggestion that the alternative would "remove all incentives from any such professionals to understand the scope of [their] statutory duty," "chill reporting of child abuse or neglect," "tacitly encourage administrators and other professionals to simply not read the statutes in full," and "reward systemic ignorance in entire school districts and corporations." Slip op. at 21, 22. Such a position ignores that commitment to the well-being of children is inherent in the role of the education professional.

Because the State failed to demonstrate that Smith knowingly failed to report an event that he had reason to believe was child abuse, his conviction should be vacated.

Dickson, C.J., concurs.

4